**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 26, 2007

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

   No. 130988

BERNARD GEORGE HARPER, JR.,

   Defendant-Appellant.

---

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

   No. 131898

JESSE GENE BURNS,

   Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

We granted leave to appeal in these two cases to determine whether an "intermediate sanction" described in MCL 769.31(b) and MCL 769.34(4) constitutes a maximum sentence under *Blakely v Washington*, 542 US 296; 124 S

Ct 2531; 159 L Ed 2d 403 (2004), for which the facts supporting a departure must be found by a jury beyond a reasonable doubt or admitted by the defendant. We conclude that because Michigan has a true indeterminate sentencing scheme, an intermediate sanction is not a maximum sentence that is governed by *Blakely*.

Under Michigan law, the *maximum* portion of a defendant's indeterminate sentence is prescribed by MCL 769.8(1), which requires a sentencing judge to impose no less than the prescribed statutory maximum sentence as the maximum sentence for most felony convictions. Michigan's unique law requiring the imposition of an intermediate sanction upon fulfillment of the conditions of MCL 769.34(4)(a) does not alter the maximum sentence that is required upon conviction and authorized by either the jury verdict or the guilty plea.[1] Rather, the conditional limit on incarceration contained in MCL 769.34(4)(a) is a matter of legislative leniency, giving a defendant the opportunity to be incarcerated for a period that is *less* than that authorized by the jury verdict or the guilty plea, a circumstance that does not implicate *Blakely*.[2]

---

[1] Accordingly, we reject the Court of Appeals contrary conclusion in *People v Uphaus,* ___ Mich App ___; ___NW2d ___ (2007) (Docket No. 267238, issued April 3, 2007).

[2] As Justice Kennedy noted in *Harris v United States,* 536 US 545, 566; 122 S Ct 2406; 153 L Ed 2d 524 (2002), "[t]he Fifth and Sixth Amendments ensure that the defendant 'will never get more punishment than he bargained for when he did the crime,' but *they do not promise that he will receive 'anything less' than that.*" (Emphasis added; citation omitted.) See also *Apprendi v New Jersey,* 530 US 466, 498-499; 120 S Ct 2348; 147 L Ed 2d 435 (2000) (Scalia, J., concurring), indicating that the Sixth Amendment provides "the right to have a
(continued…)

2

Finally, even if an intermediate sanction were a statutory maximum for purposes of *Blakely* and the sentencing courts in these cases violated *Blakely*, we conclude that any error was harmless. In both cases, the facts used by the sentencing judges to support the sentence were uncontested and supported by overwhelming evidence, such that we are convinced beyond a reasonable doubt that a jury would have reached the same result. Accordingly, we affirm the defendants' convictions and sentences.

## I. FACTS AND PROCEDURAL HISTORY

### A. *PEOPLE v HARPER*

On February 14, 2005, defendant Harper pleaded guilty of larceny in a building, which is a class G offense that carries a statutory maximum sentence of four years' imprisonment.[3] He admitted that, between December 11 and December 16, 2004, he stole coats from his employer, the Old News Boys of Flint, a nonprofit organization that solicits donations to aid needy families in Flint. Harper then sold some of the coats.

---

(…continued)
jury determine those facts that determine the maximum sentence the law allows," and that a defendant receiving a lesser sentence "may thank the mercy of a tenderhearted judge (just as he may thank the mercy of a tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted)."

[3] MCL 750.360; MCL 750.503; MCL 777.16r.

As part of the plea agreement, the prosecutor dismissed a related embezzlement charge.[4] The prosecutor also agreed not to seek an enhanced sentence based on Harper's status as a fourth-offense habitual offender.[5] The parties made no other agreement regarding Harper's sentence.

Harper did not contest that his criminal record included two prior convictions for high severity felonies, three prior convictions for low severity felonies, and one prior misdemeanor conviction. Accordingly, he received an overall prior record variable (PRV) score of 72, based on scores of 50, 20, and 2 points, respectively, for PRV 1, PRV 2, and PRV 5.[6] His offense variable (OV) score consisted of the five points he received under OV 16, because his offense caused property with a value of $1,000 or more but not more than $20,000 to be "obtained, damaged, lost or destroyed."[7] These scores placed him in the E-I cell of the sentencing grid for class G offenses. As a result, his calculated minimum sentence range was zero to 17 months.[8]

Because his minimum sentence range had an upper limit of 18 months or less, the court was required to impose an intermediate sanction—which may

---

[4] MCL 750.174(4)(a).

[5] As a fourth-offense habitual offender, Harper's potential maximum prison sentence for larceny in a building would have increased from 4 years to 15 years under MCL 769.12(1)(b).

[6] MCL 777.51; MCL 777.52; MCL 777.55.

[7] MCL 777.46(1)(c).

include, for instance, a term of probation or a jail term of 12 months or less—unless the court stated on the record a substantial and compelling reason to impose a prison term.[9] The Genesee Circuit Court concluded that departure was justified for several reasons, including Harper's extensive criminal history. The court noted Harper's record of three parole revocations, his history of absconding from parole, the bench warrants issued against him for failures to appear in court, and other "out of state" legal problems reflected in his presentence investigation report. The court added that the sentencing guidelines did not take into account that Harper had "ripped off a charity that was trying to do good for cold children." Accordingly, on March 11, 2005, the court sentenced Harper to a minimum prison term of 24 months, and a maximum term of 48 months with credit for time served.

The Court of Appeals denied defendant's delayed application for leave to appeal, citing lack of merit in the grounds presented. Harper then applied for leave to appeal in this Court. We granted leave to consider whether his sentence, as an upward departure from an intermediate sanction, violated his constitutional right to have "'any fact that increases the penalty for a crime beyond the prescribed statutory maximum . . . submitted to a jury, and proved beyond a

---

(…continued)
[8] MCL 777.68.
[9] MCL 769.34(4)(a); MCL 769.31(b).

5

reasonable doubt.'" *Blakely, supra* at 301, quoting *Apprendi v New Jersey,* 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000).[10]

## B. *PEOPLE v BURNS*

In July 2002, defendant Burns pleaded guilty of attempted breaking and entering of a building. His recommended minimum sentence range under the guidelines was zero to 11 months, which placed him in an intermediate sanction cell. Burns was placed on probation for three years. Among the conditions of probation were that he must not violate the law, that he must not engage in threatening or assaultive behaviors, and that he must avoid alcohol and illegal drug consumption.

In June 2005, Burns was charged with four counts of violating the terms of his probation: using alcohol, committing fourth-degree criminal sexual conduct, engaging in harassment, and engaging in assaultive behavior. Burns pleaded not guilty to the probation violation charges.

A probation violation hearing was held. Two 18-year-old women testified that Burns had approached them near a boat ramp on Lake Michigan in Ottawa County. After engaging in small talk, Burns asked one of the women if she gave "good head." He also touched the woman on the buttocks and commented that it was "nice." Burns asked the other woman similar sexual questions and put his

---

[10] 477 Mich 933 (2006).

6

arm around her. The two women wrote down Burns's license plate number and reported the incident to the police.

A police officer came to investigate the complaint. The officer stopped Burns's boat. The two women identified Burns as the person who had assaulted them. Although Burns initially denied that the incident had occurred, he eventually admitted to the officer that he had asked the women if they knew how to give "a blow job." He also admitted that he had touched one woman on the buttocks and the other on the shoulder. He further told the officer that he had consumed about six beers and was "buzzed." Burns was administered a preliminary breath test that registered a blood alcohol level above the legal limit.

Burns called no witnesses and presented no evidence at the probation violation hearing. The trial court found, by a preponderance of the evidence, that Burns had been intoxicated, that he had committed fourth-degree criminal sexual conduct, and that he had done so in an intimidating, aggressive manner.

At the probation violation sentencing, the trial court departed from the original guidelines recommendation of zero to 11 months and imposed a sentence of 18 months to 5 years. The court explained its decision:

> Well, I'm glad to hear that you've found religion and the reason to—it can give some meaning to your life. It doesn't however change what you did here. You know, there wasn't any question but that you did this to these young girls. I don't understand in a sense why you put them through taking the stand and testify [sic] to the whole thing, because there wasn't any issue, you did it. It expresses an attitude to me that is very puzzling. It's kind of a mean spirited thing that you did. Not that you didn't have

7

a perfect right to do it, I would never dispute your right to a hearing and to have testimony confirm it, but it wasn't a close case, it was a clear cut case of a great deal of abuse on your part. You were about as intimidating and—to those young girls and you scared the devil out of them.

It's a difficult thing to understand how you could publicly do that to people, young girls you didn't even know, you didn't have any—it was gross, it was very gross. Very intimidating.

I suspect because of the fact that you fondled the one young lady you're probably going to be looking at some serious time in Holland if you're convicted [of fourth-degree criminal sexual conduct]. I suspect you will be because the girls told the story very honestly in my opinion. You're very likely going to get convicted and go to prison for that one.

I seldom ever exceed guidelines, in fact I can't recall a time that I have, but I'm going to in your case. The behavior that you exhibited here certainly is not or was not contemplated in arriving at your original guidelines. It was gross, it was abusive, and I believe there's a compelling reason to exceed guidelines.

It's the sentence of this Court that you be committed to the Michigan Department of Corrections for a term of 18 months to a maximum of 5 years. You have credit I believe for 142 days in the county jail.

On the departure evaluation form, the court stated that the original guidelines recommendation of zero to 11 months failed "to consider [defendant's] violation behavior—which constitutes a substantial and compelling reason for a moderate departure . . . ."[11]

---

[11] Contrary to the apparent assumptions of Justice Kelly, *post* at 4-6, and Justice Cavanagh, *post* at 2, the sentencing judge followed the proper procedure for stating his reasons for departure. A judge is required to "*state*[] *on the record* a substantial and compelling reason to sentence the individual to the jurisdiction of
(continued…)

Burns moved for resentencing, arguing that the fact that his sentence exceeded the guidelines range on the basis of facts neither admitted by him nor found by a jury beyond a reasonable doubt violated his due process rights under *Blakely*. The trial court denied the motion because this Court had stated in *People v Claypool,* 470 Mich 715, 730 n 14; 684 NW2d 278 (2004), that *Blakely* did not apply to Michigan's indeterminate sentencing system. The court further explained:

> Therefore, the Court was not required to find Defendant guilty of 4th Degree Criminal Sexual Conduct beyond a reasonable doubt in order to consider that behavior for the purpose of exceeding guidelines. The Court found objective and verifiable evidence on the record, including Defendant's admission to the public safety officer that he touched the victim's "butt" and the uncontroverted testimony of the victims themselves that Defendant was harassing and intimidating. Such evidence was not considered in the original sentencing, and the Court maintains that Defendant's behavior constituted substantial and compelling reasons for exceeding statutory guidelines.

The Court of Appeals denied Burns's application for leave to appeal for lack of merit in the grounds presented. Burns then sought leave to appeal in this Court. We granted the application and directed the parties to address whether an intermediate sanction described in MCL 769.31(b) and MCL 769.34(4) is a statutory maximum sentence under *Blakely* "for which the departure reasons must

---

(…continued)
the department of corrections." MCL 769.34(4)(a) (emphasis added); see also MCR 6.425(E)(1)(e). The judge did precisely this.

9

be decided by a jury or admitted by the defendant, where the defendant is being sentenced for a violation of probation." 477 Mich 933 (2006).

## II. STANDARD OF REVIEW

We review de novo questions of constitutional law. *People v Nutt,* 469 Mich 565, 573; 677 NW2d 1 (2004).

## III. ANALYSIS

### A. MICHIGAN'S STATUTORY SENTENCING SCHEME UNDER *BLAKELY*

Under the Due Process Clause of the Fifth Amendment and the jury trial guarantees of the Sixth Amendment, any fact that increases the maximum penalty for a crime must be submitted to a jury and proven beyond a reasonable doubt.[12] The Fourteenth Amendment requires that the states' criminal sentencing schemes conform to this rule.[13] The rule includes exceptions for the fact of prior convictions and any facts admitted by the defendant.[14]

Accordingly, when sentencing a defendant, a judge may not exceed the maximum sentence authorized by the jury verdict or the guilty plea except on the basis of the facts reflected in the jury verdict, the facts admitted by the defendant, and the defendant's record of prior convictions. In other words, the statutory maximum, for *Blakely* purposes, is the maximum sentence a judge may impose

---

[12] *Apprendi, supra* at 476, 490.

[13] *Id.* at 476.

[14] *Blakely, supra* at 303; *Apprendi, supra* at 490.

"*without* any additional findings." *Blakely, supra* at 304. In the wake of *Blakely,* state courts have been called upon to define the relevant statutory maximums within which judges may continue to exercise the traditional sentencing discretion legislatures afford them.

The first question in this inquiry involves whether a state's sentencing scheme is determinate or indeterminate. As we have previously explained, under a determinate scheme, conviction for an offense typically exposes a defendant to a sentence of a fixed term lying in a standard range for that offense.[15] In *Blakely,* for instance, Washington's scheme prescribed a "standard range" of 49 to 53 months for the defendant's conviction of second-degree kidnapping with a firearm.[16] A judge was authorized to depart beyond the standard range on the basis of "'substantial and compelling reasons justifying an exceptional sentence.'"[17] The statute permitted the reasons for departure to be based on facts found by the sentencing judge.[18] In *Blakely*, the judge sentenced the defendant to an exceptional 90-month sentence on the basis of the judge's finding that the defendant perpetrated the kidnapping with "deliberate cruelty."[19] Accordingly, the

---

[15] See *People v Drohan,* 475 Mich 140, 159-160; 715 NW2d 778 (2006), citing *Claypool, supra* at 730 n 14.

[16] *Blakely, supra* at 299, citing Wash Rev Code 9.94A.320.

[17] *Blakely, supra* at 299, citing Wash Rev Code 9.94A.120(2).

[18] *Blakely, supra* at 299, citing Wash Rev Code 9.94A.120(3).

[19] *Blakely, supra* at 300.

sentence violated the defendant's constitutional rights because it exceeded the fixed statutory maximum sentence range that was authorized solely by the facts that the defendant admitted when he pleaded guilty of second-degree kidnapping.[20]

In contrast, under an indeterminate scheme, a defendant receives a minimum sentence and a maximum sentence. In Michigan, for instance, the law provides that the maximum portion of a defendant's indeterminate sentence must be the "maximum penalty provided by law . . . ."[21] As will be explained in detail

---

[20] *Id.* at 304-305.

[21] MCL 769.8(1); *Drohan, supra* at 160. Michigan's habitual-offender statutes are an exception to the Legislature's requirement that the maximum portion of a defendant's indeterminate sentence be the maximum penalty provided by law. The habitual-offender statutes grant a sentencing judge the discretion to increase the maximum portion of a recidivist's indeterminate sentence beyond the statutory limit on the basis of the fact of a prior conviction, as permitted by *Apprendi* and *Blakely*. *Id.* at 161 n 13; MCL 769.10(1)(a) (upon a second felony conviction, a judge may impose a maximum sentence of up to 1½ times the statutory maximum prescribed for a first conviction of the offense); MCL 769.11(1)(a) (upon a third felony conviction, a judge may impose a maximum sentence of up to twice the statutory maximum); MCL 769.12(1)(a) and (b) (upon a fourth or subsequent felony conviction, a judge may impose a maximum sentence of up to 15 years for offenses carrying statutory maximum terms of less than 5 years and a sentence of life in prison for offenses carrying maximum terms of 5 years or more). When a judge imposes an increased maximum sentence under these statutes, the defendant's sentence remains an indeterminate sentence. Moreover, the judge is expressly prohibited from sentencing a recidivist to a maximum sentence that is less than the maximum term for a first conviction. MCL 769.10(2); MCL 769.11(2); MCL 769.12(2).

A very limited number of offenses carry determinate sentences in Michigan, such as first-degree murder, MCL 750.316 (life in prison without the possibility of parole), and carrying or possessing a firearm when committing or

(continued…)

12

later in this opinion, the sentencing judge ascertains the minimum portion of a defendant's indeterminate sentence by calculating the minimum sentence range under the statutory sentencing guidelines, which consider the circumstances of the crime as well as the defendant's criminal history. The judge may exceed the statutorily recommended minimum sentence range in a particular case if the judge finds a "substantial and compelling reason" to depart that the guidelines do not adequately take into account.[22] While the sentencing judge fixes the minimum portion of a defendant's indeterminate sentence, a defendant is still liable to serve his maximum sentence and may only be released before the maximum term has expired at the discretion of the parole board.[23]

Thus, under an indeterminate sentencing scheme like Michigan's, judicial fact-finding does not present the same constitutional problems as judicial fact-finding used to exceed the statutory maximum under a determinate scheme,[24]

---

(…continued)
attempting to commit a felony, MCL 750.227b (two years in prison for a first offense, five years for a second offense, and ten years for a third or subsequent offense).

[22] MCL 769.34(3).

[23] MCL 791.234; MCL 791.235; *Drohan, supra* at 163.

[24] The United States Supreme Court has firmly established that, when a legislature defines the outer limit of an indeterminate sentence on the basis of the elements of an offense, judicial fact-finding may be employed to set the minimum sentence. *McMillan v Pennsylvania,* 477 US 79, 86-88, 93; 106 S Ct 2411; 91 L Ed 2d 67 (1986); see also *Harris, supra* at 567 (opinion of Kennedy, J.) ("Read together, *McMillan* and *Apprendi* mean that those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for
(continued…)

because judicial fact-finding under our scheme never affects the statutory maximum sentence that was authorized by the jury verdict of guilty or the defendant's guilty plea.[25]  As the *Blakely* Court observed in distinguishing the two types of schemes:

---

(…continued)
the purposes of the constitutional analysis. Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings.").

[25] The fact that a defendant is always liable to serve the statutory maximum sentence in Michigan also distinguishes our scheme from the schemes Justice Kelly claims are indistinguishable.  She compares, for instance, *Ring v Arizona,* 536 US 584, 592-593; 122 S Ct 2428; 153 L Ed 2d 556 (2002), in which the United States Supreme Court rejected an Arizona sentencing law allowing the sentencing judge to determine, at a separate posttrial hearing, whether the defendant would be subject to a maximum sentence of either death or life imprisonment.  *Post* at 22-24.  The state argued that the jury verdict authorized either sentence.  The *Ring* Court disagreed, given that the maximum sentence of death could *only* be imposed if the judge found aggravating circumstances.  *Ring, supra* at 603-604.  An Arizona offender also could not know until sentencing was complete whether he would be subject to the death penalty for his crime.  In contrast, and contrary to Justice Kelly's contention, Michigan's indeterminate sentences *do* "have only one maximum sentence," *post* at 16-17, and the statutes unambiguously notify Michigan offenders of the statutory maximum terms applicable to their crimes.

In her dissent in *People v McCuller,* 479 Mich ___; ___ NW2d ___ (2007) (Docket No. 128161, decided July 26, 2007), Justice Kelly also compares the federal sentencing system as it existed before the United States Supreme Court's decision in *United States v Booker,* 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005).  But the federal sentencing guidelines did not merely set a minimum sentence and leave a defendant liable to serve the statutory maximum, as in Michigan.  Rather, in *Booker*, as Justice Kelly concedes, although a separate federal statute set an absolute maximum sentence of life in prison for the defendant's offense, in Booker's particular case "the guidelines *required* a *maximum* sentence of 21 years and 10 months' imprisonment."  *McCuller, supra*

(continued…)

14

[T]he Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence . . . . [*Blakely*, *supra* at 308-309.]

Similarly, as we observed in *People v Drohan,* 475 Mich 140, 162; 715 NW2d 778 (2006), in Michigan, "the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict." For this reason, a defendant's constitutional rights are not violated when a sentencing judge exceeds the recommended minimum sentence range on the basis of a substantial and compelling reason, as the respective judges did in these cases; even an upward

---

(…continued)
at ___ (Kelly, J., dissenting) (emphasis added); see *Booker, supra* at 227. Accordingly, the judge's upward departure from that range on the basis of his own findings was impermissible given the then-mandatory nature of the guidelines, although the 30-year sentence imposed was within the outer limit of the absolute maximum. *Booker, supra* at 226-227. As we will more fully explain later in this

(continued…)

departure from the guidelines may not exceed the maximum penalty provided by law. *Id.* at 162 n 15. Therefore, we reaffirm our holding in *Drohan* that Michigan's indeterminate sentencing scheme is valid under *Blakely*. *Id.* at 162-164.

### B. MICHIGAN'S INTERMEDIATE SANCTION CELLS

Nonetheless, defendants argue that at least one aspect of Michigan's sentencing scheme violates *Blakely*. They claim that, when the guidelines minimum sentence range calls for an intermediate sanction, as it did in these cases, the intermediate sanction becomes the relevant statutory maximum sentence under *Blakely* and a defendant is *constitutionally entitled* to such a sanction. Accordingly, they claim that a judge may not exceed the range of intermediate sanction options by sentencing a defendant to an indeterminate prison term, even if the judge has a substantial and compelling reason to do so. We disagree. *Blakely* prohibits a judge from exceeding the maximum sentence authorized by the jury verdict or the guilty plea. *Blakely* does not, as defendants would have it, entitle a defendant to a sentence that is *less than* the one authorized by the verdict or plea.

A defendant's recommended minimum sentence range under the guidelines is determined on the basis of the defendant's record of prior convictions (the PRV

(…continued)
opinion, Michigan's sentencing guidelines establish a defendant's *minimum*
(continued…)

16

score), the facts surrounding his crime (the OV score), and the legislatively designated offense class.[26]   A court must generally sentence a defendant to a minimum prison term within the guidelines range[27] unless it states on the record a substantial and compelling reason to depart.[28]   A substantial and compelling reason "exists only in exceptional cases," and is an "objective and verifiable" reason that "keenly or irresistibly grabs our attention" and is "of considerable worth in deciding the length of a sentence . . . ."[29]   Departure may not be based on certain qualities of the defendant, such as gender, race, or employment status.[30]   Departure also may not be based on "an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight."   MCL 769.34(3)(b).   Finally, a minimum

---

(…continued)
sentence.  Our statutory maximums for a given offense are static.

[26] MCL 777.21(1).   The range for the minimum sentence may also be increased on the basis of a defendant's status as an habitual offender.   MCL 777.21(3).

[27] MCL 769.34(2)(a).

[28] MCL 769.34(3).

[29] *People v Babcock,* 469 Mich 247, 258; 666 NW2d 231 (2003) (internal quotations and citation omitted).

[30] MCL 769.34(3)(a).

sentence, including a departure, may not exceed ⅔ of the statutory maximum sentence.[31]

When the upper and lower limits of the recommended minimum sentence range meet certain criteria, a defendant is eligible for an intermediate sanction. If the upper limit of the minimum sentence range exceeds 18 months and the lower limit is 12 months or less, the defendant's sentence range is in a "straddle cell."[32] When the range is in a straddle cell, the sentencing court may elect either to sentence the defendant to a prison term with the minimum portion of the indeterminate sentence within the guidelines range or to impose an intermediate sanction, absent a departure.[33] If the upper limit of the minimum sentence range is 18 months or less, as it was in these cases, the cell containing the range is an "intermediate sanction cell." Under these circumstances, the statute provides that

> the court shall impose an intermediate sanction unless the court states on the record a substantial and compelling reason to sentence the individual to the jurisdiction of the department of corrections. An intermediate sanction may include a jail term that does not exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less. [MCL 769.34(4)(a).]

---

[31] MCL 769.34(2)(b). MCL 769.34 does not apply when a defendant is convicted of an offense punishable by a prison sentence of "life or any term of years" because the minimum will never exceed ⅔ of the statutory maximum sentence of life authorized by the jury verdict. *Drohan, supra* at 162 n 14.

[32] *People v Stauffer,* 465 Mich 633, 636 n 8; 640 NW2d 869 (2002).

[33] MCL 769.34(4)(c).

18

MCL 769.31(b) defines "intermediate sanction" as "probation or any sanction, other than imprisonment in a state prison or state reformatory, that may lawfully be imposed.  Intermediate sanction includes, but is not limited to, 1 or more of" several options, including probation with any conditions authorized by law, probation with jail, treatment for substance abuse or mental health conditions, and other options such as house arrest and community service.[34]  Defendants argue that, because the statute states that the sentencing court "shall" impose an

---

[34] The nonexhaustive list of intermediate sanction options includes:

(*i*) Inpatient or outpatient drug treatment or participation in a drug treatment court under chapter 10A of the revised judicature act of 1961, 1961 PA 236, MCL 600.1060 to 600.1082.

(*ii*) Probation with any probation conditions required or authorized by law.

(*iii*) Residential probation.

(*iv*) Probation with jail.

(*v*) Probation with special alternative incarceration.

(*vi*) Mental health treatment.

(*vii*) Mental health or substance abuse counseling.

(*viii*) Jail.

(*ix*) Jail with work or school release.

(*x*) Jail, with or without authorization for day parole under 1962 PA 60, MCL 801.251 to 801.258.

(*xi*) Participation in a community corrections program.

(*xii*) Community service.

(*xiii*) Payment of a fine.

(*xiv*) House arrest.

(*xv*) Electronic monitoring.  [MCL 769.31(b).]

intermediate sanction, they were constitutionally entitled under *Blakely* to either a jail term of 12 months or less or one or more of the other intermediate sanction options available to the sentencing court.

Most significantly, they cite *Cunningham v California,* 549 US ___; 127 S Ct 856; 166 L Ed 2d 856 (2007), in which the United States Supreme Court examined California's determinate sentencing law (DSL), which contains language that is superficially similar to the language describing intermediate sanction cells in MCL 769.34(4)(a) quoted above.[35] In *Cunningham,* the defendant was tried and convicted of continuous sexual abuse of a child under the age of 14.[36] The statute defining the offense prescribed three precise terms of imprisonment—lower, middle, and upper terms of 6, 12, and 16 years, respectively.[37] The statute that controlled which term a sentencing judge should impose provided that "'the court *shall* order imposition of the middle term, *unless* there are circumstances in aggravation or mitigation of the crime.'"[38] Circumstances in aggravation or mitigation were to be determined by the court after considering the trial record, the probation officer's report, statements

---

[35] *Cunningham, supra,* 127 S Ct at 861-862.

[36] *Id.,* 127 S Ct at 860.

[37] *Id.,* 127 S Ct at 861, citing Cal Penal Code 288.5(a) (stating that a person convicted of continuous sexual abuse of a child "shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years").

[38] *Cunningham, supra,* 127 S Ct at 861, quoting Cal Penal Code 1170(b) (emphasis added).

submitted by the parties, the victim, or the victim's family, and "'any further evidence introduced at the sentencing hearing.'"[39] The judge in *Cunningham* sentenced the defendant to the 16-year upper term on the basis of the judge's findings of aggravating facts, including the particular vulnerability of the victim and the defendant's violent conduct, which indicated a serious danger to the community.[40]

The *Cunningham* Court concluded that the sentence violated the defendant's rights because

> an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance. . . . An element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance. . . . Instead, aggravating circumstances depend on facts found discretely and solely by the judge. In accord with *Blakely*, therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. 542 U.S., at 303, 124 S.Ct. 2531 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (emphasis in original)). Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, . . . the DSL violates *Apprendi*'s bright-line rule: Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S., at 490, 120 S.Ct. 2348. [*Cunningham, supra,* 127 S Ct at 868.]

---

[39] *Cunningham, supra,* 127 S Ct at 861-862, quoting Cal Penal Code 1170(b).

[40] *Cunningham, supra,* 127 S Ct at 860.

Defendants argue that MCL 769.34(4)(a), which similarly provides that the court "*shall* impose an intermediate sanction *unless* the court states on the record a substantial and compelling reason to sentence the individual to the jurisdiction of the department of corrections," renders their sentences indistinguishable from the invalid sentence in *Cunningham.* We hold that the superficial similarity of the statutory language in California's determinate scheme does not transform Michigan's intermediate sanction cells into the relevant statutory maximums for *Blakely* purposes. Rather, the similar language in MCL 769.34(4)(a) yields a different result when read in the context of Michigan's indeterminate scheme.

Statutes that address the same subject or share a common purpose are *in pari materia* and must be read together as a whole.[41] This general rule not only applies to our interpretation of Michigan's sentencing scheme, it requires us to examine it in the context of related statutes, including laws defining intermediate sanctions such as probation.[42] Further, we presume that a statute is constitutional. "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004).[43]

---

[41] *People v Buehler,* 477 Mich 18, 26-27; 727 NW2d 127 (2007).

[42] *Id.*

[43] See also *Sears v Cottrell,* 5 Mich 251, 259 (1858):

No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature

(continued…)

Michigan's sentencing laws clearly require that the maximum portion of every indeterminate sentence be no less than the "maximum penalty provided by law . . . ." MCL 769.8(1). Thus, the "'statutory maximum' for *Apprendi* purposes," or "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant,*"[44] is the maximum term set by statute for each enumerated offense.[45] Thus, when Harper pleaded guilty of larceny in a building, his guilty plea alone required the imposition of a maximum sentence of four years' imprisonment. Similarly, when Burns pleaded guilty of attempted breaking and entering, his conviction required the imposition of a five-year maximum sentence. The guidelines calculations, which might result in an intermediate sanction cell, relate solely to a defendant's recommended *minimum* sentence range. The guidelines do nothing to alter or affect the maximum sentence that must be imposed solely on the basis of the jury

---

(…continued)

> are to be presumed constitutional until the contrary is shown; and it is only when they *manifestly* infringe some provision of the constitution that they can be declared void for that reason. In cases of doubt, every possible presumption, not clearly inconsistent with the language and the subject matter, is to be made in favor of the constitutionality of the act.

[44] *Blakely, supra* at 303 (emphasis in original).

[45] As we have explained, the habitual-offender statutes provide a slight exception to this rule by permitting a sentencing judge to increase a maximum sentence on the basis of the fact of prior conviction. See n 21 of this opinion; see also *Drohan, supra* at 161 n 13.

verdict or the guilty plea.  The language of our sentencing scheme makes this clear in several ways.

MCL 769.8 describes a judge's general sentencing powers and duties:

(1) When a person is convicted for the first time for committing a felony and the punishment prescribed by law for that offense may be imprisonment in a state prison, *the court* imposing sentence shall not fix a definite term of imprisonment, but *shall fix a minimum term*, except as otherwise provided in this chapter. *The maximum penalty provided by law shall be the maximum sentence in all cases except as provided in this chapter and shall be stated by the judge in imposing the sentence.*

(2) Before or at the time of imposing sentence, the judge shall ascertain by examining the defendant under oath, or otherwise, and by other evidence as can be obtained tending to indicate briefly the causes of the defendant's criminal character or conduct, which facts and other facts that appear to be pertinent in the case the judge shall cause to be entered upon the minutes of the court.  [Emphasis added.]

Thus, the statute requires that a judge "shall fix a minimum term," but "[*t*]*he maximum penalty provided by law shall be the maximum sentence in all cases . . . .*"  MCL 769.8(1) (emphasis added).  Although each mandate is modified by "except as otherwise provided in this chapter" or "except as provided in this chapter," respectively, this or similar language has been included in the statute since it was enacted in 1927.[46]  Accordingly, this language creating an exception to the rule that "[t]he maximum penalty provided by law shall be the

---

[46] 1927 PA 175.  The language originally read "except as hereinafter provided" and "except as herein provided."  It was modified to its current form by 1978 PA 77.

maximum sentence" was not originally aimed at intermediate sanction cells; intermediate sanction cells were first suggested in the sentencing scheme in 1994 and are a mandatory component of sentencing only for crimes committed after January 1, 1999.[47] Therefore, it takes further examination of the statutory scheme to discern whether intermediate sanctions are meant to be exceptions to the rule.

The Legislature explicitly described exceptions to indeterminate sentencing in our sentencing scheme. For example, MCL 769.9(1) provides: "The provisions of this chapter relative to indeterminate sentences shall not apply to a person convicted for the commission of an offense for which the only punishment prescribed by law is imprisonment for life." Similarly, MCL 769.9(2) addresses cases in which the sentencing judge has the option to impose a sentence of either life imprisonment or a term of years. If the judge imposes a sentence of life imprisonment, the judge may not also impose a separate minimum sentence. MCL 769.9(2). As we noted previously, the Legislature also explicitly provided for determinate sentences for a limited number of particular offenses, such as possession of a firearm during the commission of a felony, MCL 750.227b. In contrast, nowhere did the Legislature state that intermediate sanctions are an exception to indeterminate sentencing.

To the contrary, intermediate sanctions are an explicit component of the statutory scheme for setting a defendant's *minimum* sentence. A sentencing court

---

[47] 1994 PA 445; MCL 769.34(2), as amended by 1998 PA 317.

25

calculates a defendant's PRVs and OVs in order to determine "the recommended *minimum* sentence range." MCL 777.21(1) (emphasis added). MCL 769.34 governs the courts' application of the guidelines and consistently addresses the *minimum* sentence range. For instance, MCL 769.34(2) provides:

> Except as otherwise provided in this subsection or for a departure from the appropriate minimum sentence range provided for under subsection (3), the minimum sentence imposed by a court of this state for a felony enumerated in part 2 of chapter XVII committed on or after January 1, 1999 shall be within the appropriate sentence range under the version of those sentencing guidelines in effect on the date the crime was committed.

Subsection 4 defines intermediate sanction cells on the basis of the upper and lower limits of the "recommended *minimum* sentence range." MCL 769.34(4)(a) and (c) (emphasis added). The statutory maximum for the relevant offense— which is the maximum authorized by the conviction and therefore the relevant maximum for *Blakely* purposes—has never changed.

That the statutory maximum is not altered by an intermediate sanction cell becomes particularly evident when we consider the range of intermediate sanctions available to the sentencing judge. Most significantly, judges commonly impose a term of probation, which may also be combined with other sanctions such as jail or substance abuse treatment.[48] Accordingly, the nature of a

---

[48] See MCL 769.31(b)(*i*), (*ii*), and (*iv*), concerning drug treatment, probation with any conditions required or authorized by law, and probation with jail, respectively.

probationary sentence aids our understanding of whether the Legislature intended intermediate sanctions to constitute maximum terms for *Blakely* purposes.

MCL 771.1(1), originally enacted in 1927,[49] authorizes a sentencing judge to impose probation in lieu of prison for most crimes if the judge "determines that the defendant is not likely again to engage in an offensive or criminal course of conduct and that the public good does not require that the defendant suffer the penalty imposed by law."[50] Thus, the imposition of probation is a permissive matter left to the discretion of the sentencing judge. The Legislature provided a detailed definition of probationary sentences in MCL 771.4:

> It is the intent of the legislature that *the granting of probation is a matter of grace conferring no vested right to its continuance*. If during the probation period the sentencing court determines that the probationer is likely again to engage in an offensive or criminal course of conduct or that the public good requires revocation of probation, the court may revoke probation. *All probation orders are revocable in any manner the court that imposed probation considers applicable either for a violation or attempted violation of a probation condition or for any other type of antisocial conduct or action on the probationer's part for which the court determines that*

---

[49] 1927 PA 175.

[50] MCL 771.1(1) provides in full:

> In all prosecutions for felonies, misdemeanors, or ordinance violations other than murder, treason, criminal sexual conduct in the first or third degree, armed robbery, or major controlled substance offenses, if the defendant has been found guilty upon verdict or plea and the court determines that the defendant is not likely again to engage in an offensive or criminal course of conduct and that the public good does not require that the defendant suffer the penalty imposed by law, the court may place the defendant on probation under the charge and supervision of a probation officer.

*revocation is proper in the public interest.* Hearings on the revocation shall be summary and informal and not subject to the rules of evidence or of pleadings applicable in criminal trials. In its probation order or by general rule, the court may provide for the apprehension, detention, and confinement of a probationer accused of violating a probation condition or conduct inconsistent with the public good. The method of hearing and presentation of charges are within the court's discretion, except that the probationer is entitled to a written copy of the charges constituting the claim that he or she violated probation and to a probation revocation hearing. The court may investigate and enter a disposition of the probationer as the court determines best serves the public interest. *If a probation order is revoked, the court may sentence the probationer in the same manner and to the same penalty as the court might have done if the probation order had never been made.* [Emphasis added.]

Thus, probation is, by definition, "a matter of grace conferring no vested right to its continuance." When a judge imposes a sentence of probation, the Legislature intended that probation be revocable on the basis of a judge's findings of fact at an informal hearing, and largely at the judge's discretion. Indeed, a judge may revoke probation for "antisocial conduct or action on the probationer's part for which the court determines that revocation is proper in the public interest." *Id*.

In accord, the United States Supreme Court has recently reaffirmed that probation revocation hearings may be "'proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply.'" *Samson v California*, ___ US ___, ___; 126 S Ct 2193, 2198; 165 L Ed 2d 250 (2006), quoting *United States v Knights*, 534 US 112, 120; 122 S Ct 587; 151 L Ed 2d 497 (2001). "Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled."'" *Knights,*

28

*supra* at 119 (citations omitted). Cf. *United States v Cranley,* 350 F3d 617, 621 (CA 7, 2003) ("[I]t has long been understood that a fundamental and unchallenged condition of probation is that the probationer surrender his right to trial by jury should the government seek revocation, and thus imprisonment.").

Moreover, for this reason, federal courts observe that the rule of *Blakely* and *Apprendi* does not apply to probation revocation hearings. In the words of the Court of Appeals for the Second Circuit,

> a sentence of supervised release by its terms involves a surrender of certain constitutional rights and this includes surrender of the due process rights articulated in *Apprendi* . . . .
>
> . . . Given a prior conviction and the proper imposition of conditions on the term of supervised release, when a defendant fails to abide by those conditions the government is not then put to the burden of an adversarial criminal trial. [*United States v Carlton,* 442 F3d 802, 809 (CA 2, 2006), quoted with approval by *United States v Cordova*, 461 F3d 1184, 1187 (CA 10, 2006).]

The Court of Appeals for the Ninth Circuit recently reached the same conclusion when addressing arguments similar to those advanced by defendant Burns. In *United States v Ray,* 484 F3d 1168, 1169 (CA 9, 2007), the defendant was initially sentenced to a short prison term, followed by a three-year term of supervised release. She later admitted that she had violated certain conditions of the release, and the court revoked her supervised release. *Id.* She argued that her maximum term of imprisonment for purposes of resentencing was the high end of her federal sentencing guidelines range, rather than the statutory maximum imposed by the United States Code. *Id.* at 1170. The court observed that the courts of appeals in

the First, Second, and Fifth circuits had already rejected this argument in the supervised release context. *Id.* at 1171-1172. Further, the federal circuits had unanimously rejected the same argument in the analogous context of resentencing after revocation of probation. See *id.* at 1172. The Ninth Circuit held:

> We now join our sister circuits in holding that [*United States v Booker,* 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005), the counterpart to *Blakely* in the federal sentencing context,] does not define the "statutory maximum" as the high end of the Guidelines range for sentences imposed for violations of supervised release. Instead, the definition of "statutory maximum" continues to come from the United States Code. We may not modify Congress' clear intent that the *statutory* maximum determines the allowable period of imprisonment after the revocation of supervised release, even if the Guidelines prescribed a lower maximum sentence for the particular defendant. [*Id.* at 1171.][51]

---

[51] Justice Kelly contends that differences between Michigan's sentencing scheme and the federal sentencing scheme preclude any comparison in this context. She observes that, under the federal scheme, a judge need not adhere to the originally established guidelines range when resentencing a defendant after he violates the conditions of probation. *Post* at 17, citing *United States v Goffi,* 446 F3d 319, 322 (CA 2, 2006). Rather, upon resentencing, a federal judge consults relevant guidelines or policy statements issued by the United States Sentencing Commission. *Id.*; 18 USC 3553(a)(4)(B). The judge is free to exceed the initial guidelines range *as long as the sentence is still within the absolute statutory maximum for the underlying conviction. Goffi, supra* at 322-323. For comparison, in Michigan the sentencing guidelines continue to apply in this context and, as usual, a judge must sentence the defendant within the guidelines or state substantial and compelling reasons for departure. *People v Hendrick,* 472 Mich 555, 560, 562-563; 697 NW2d 511 (2005). Moreover, "it is perfectly acceptable to consider postprobation factors in determining whether substantial and compelling reasons exist to warrant an upward departure." *Id.* at 562-563.

We fail to see how the differences between the two schemes "completely undermine[] [our] argument." *Post* at 17-18. The federal system affords a judge general discretion to exceed the original guidelines range when sentencing a defendant who has violated probation as long as the judge consults relevant

(continued…)

30

Perhaps most significantly, the Michigan Legislature did not modify or repeal the probation statutes when it enacted the mandatory sentencing guidelines. Rather, the statutes inform each other. The limits of a sentence that includes probation are defined in MCL 771.1 *et seq.,* which provide, for instance, time limits for probationary sentences on the basis of the crime committed. See, e.g., MCL 771.2; MCL 771.2a. Indeed, the statute defining intermediate sanction cells, MCL 769.34(4)(a), does not define or limit available intermediate sanctions; it merely relies on and reiterates definitions of intermediate sanctions provided by other statutes. Crucially, the mandate in MCL 769.34(4)(a) that a jail term imposed as part of an intermediate sanction may not "exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less," reiterates a mandate from the probation statutes that long preceded the enactment of MCL 769.34.[52] MCL 771.3(2) provides, in part:

> As a condition of probation, the court may require the probationer to do 1 or more of the following:

---

(…continued)
guidelines or policy statements. The Michigan system affords such discretion as long as the judge gives legally sufficient substantial and compelling reasons for departure. *In both systems, the statutory maximum authorized by jury verdict or the defendant's guilty plea has not changed and may not be exceeded.* Neither system grants a defendant a special right to a sentence limited to the initial guidelines range merely because he was initially afforded probation and chose to violate the probationary conditions.

[52] The 12-month limit placed on jail time by MCL 771.3(2)(a) has been effective since 1981, when it was increased from six months by 1980 PA 514.

(a) *Be imprisoned in the county jail for not more than 12 months*, at the time or intervals, which may be consecutive or nonconsecutive, within the probation as the court determines. *However, the period of confinement shall not exceed the maximum period of imprisonment provided for the offense charged if the maximum period is less than 12 months.* [Emphasis added.]

Thus, first, the 12-month limitation, as restated in MCL 769.34(4)(a), is not a new, independent limit on jail time established by the sentencing guidelines in the intermediate sanction cell context. Second, the nature of a probationary sentence clearly reveals the Legislature's intent that the 12-month limit on incarceration may be exceeded, even when jail time is imposed pursuant MCL 769.34(4)(a). "Probation with jail" is explicitly listed as an intermediate sanction in MCL 769.31(b)(*iv*). Yet if a judge imposes an initial jail term of 12 months or less with a term of probation, the term of probation effectively becomes meaningless.[53] For if a judge may never impose additional imprisonment, he is unable to revoke probation. This is because, when revoking probation, "the court may sentence the probationer in the same manner and to the same penalty as the court might have done if the probation order had never been made." MCL 771.4. But to avoid placing a defendant in double jeopardy by punishing him twice for

---

[53] Justice Kelly contrasts a situation in which a defendant is sentenced *only* to 12 months or less of jail time without a period of probation. *Post* at 17 n 12. A judge *may* simply sentence a defendant to jail with no further monitoring or evaluation. But the statute *also* empowers the judge to impose both jail and probation. It is this latter option that Justice Kelly's analysis would render impossible to exercise.

the same offense, a judge must subtract the initial jail term from any term of incarceration he imposes upon revocation and resentencing.[54] If the judge could not depart upward by considering postprobation factors, such as the defendant's probation-violating behavior, the judge would be effectively unable to revoke probation or resentence the defendant because the judge would have exhausted his ability to impose jail time. The same problem would occur even when a judge initially sentenced a defendant only to probation; if the defendant continually violated probation after multiple revocations and one or more short jail sentences, the judge would quickly lose the ability to revoke probation by exhausting the 12 months of available jail time. The overall result would be essentially to make 12 months of jail or less the *only* sanction truly available to judges in the intermediate sanction cell context; after a defendant had served 12 months in jail, a judge would have no means to enforce the conditions of other sanctions such as probation.[55]

In sum, we find no basis for the conclusion that the Legislature intended an intermediate sanction to become a new statutory maximum for *Blakely* purposes

---

[54] *People v Sturdivant*, 412 Mich 92; 312 NW2d 622 (1981), mod *People v Whiteside*, 437 Mich 188 (1991); see also *North Carolina v Pearce,* 395 US 711; 89 S Ct 2072; 23 L Ed 2d 656 (1969), overruled in part on other grounds by *Alabama v Smith*, 490 US 794 (1989).

[55] Justice Kelly essentially treats the 12-month jail term as the only meaningful measure of an intermediate sanction, saying that the term "defines the upper limit of an intermediate sanction cell sentence[.]" *Post* at 15. But because intermediate sanctions can include a jail term *added to* other sanctions, any characterization of the "upper limit" of an intermediate sanction must take into account the nature and effect of additional sanctions such as probation.

when a defendant's minimum sentence range is in an intermediate sanction cell.[56]

To hold otherwise ignores the definition and function of intermediate sanctions such as probation and deprives them of their intended effect. Further, imposition of an intermediate sanction never affects the *maximum* sentence "provided by law," MCL 769.8(1), as listed in MCL 777.11 *et seq.,* for the crime of which the defendant has been convicted. When statutes, such as those listed in MCL 777.11 *et seq.*, establish absolute maximum sentences on the basis of the elements of the offense, it is entirely within a legislature's province to authorize judges to exercise their discretion and expertise when sentencing defendants below those maximum limits, as they do by sentencing and monitoring probationers, as well as by subsequently revoking a probationary sentence, if appropriate. As Justice Kennedy lucidly explained in his plurality opinion in *Harris v United States,* 536 US 545, 567; 122 S Ct 2406; 153 L Ed 2d 524 (2002) (Kennedy, J., joined by Rehnquist, CJ., and O'Connor and Scalia, JJ.):

---

[56] Moreover, we disagree with Justice Kelly that, "[e]ven if the Legislature intended [that probation violators be punished with more than 12 months in jail], it is irrelevant." *Post* at 21. As we have explained, the Legislature has successfully conveyed its intent—and therefore has also put potential offenders on notice—that no defendant is guaranteed a sentence of only 12 months' jail time merely because his minimum sentence range under the guidelines falls into an intermediate sanction cell. Thus, even under Justice Kelly's theory that the legislative scheme appears to improperly shift sentencing discretion to judges under limited circumstances, the Legislature's clear intent in this area would require a result like the one employed in *Booker*. There the United States Supreme Court rendered the offending portions of the federal sentencing guidelines advisory in order to best effectuate Congress's intent in enacting them. *Booker, supra* at 245, 265.

34

Read together, *McMillan* [*v Pennsylvania,* 477 US 79; 106 S Ct 2411; 91 L Ed 2d 67 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis. Within the range authorized by the jury's verdict, however, the political system may channel judicial discretion—and rely upon judicial expertise—by requiring defendants to serve minimum terms after judges make certain factual findings.

Our Legislature clearly limits sentencing judges' exercise of discretion when it sees fit to do so, as exemplified by the crimes for which judges must impose statutorily mandated terms, such as life in prison, MCL 769.9(1), or a determinate number of years, MCL 750.227b. *Blakely* does not foreclose the Legislature's concomitant ability to define circumstances under which a judge may exercise sentencing discretion within the outer limit authorized by the jury verdict, as in the intermediate sanction context.

In Michigan, every offender is on notice of the maximum sentence to which he is subject on the basis of the elements of the crime when he is convicted either by a jury or as the result of a plea, as is exemplified by these cases. In *Harper*, for instance, before Harper pleaded guilty of larceny in a building the judge informed him, as required by MCR 6.302(B)(2), that the maximum penalty for the crime is four years in prison.[57] The judge also specifically responded when Harper stated that he had heard that the judge "was a fair judge and wouldn't go over the

---

[57] See MCL 777.16r.

guidelines . . . ." The judge explained, first, that lawyers' initial guidelines estimations are often wrong. The judge added:

> . . . I don't know what your history is, I might wanna drop a big hammer on you or I might just decide to give you a feather and tell you to walk out of the door, I don't know what I'm going to do and I'm not making any predications today . . . .

When asked if he understood this, Harper responded: "Yes, sir, your Honor."

When asked if anyone had told him that the judge would "go easy on" him, Harper answered: "No, sir." The judge continued:

> Now, I've asked you all those kinds of questions because you could file an appeal later on and you could say that there was something else going on, for example, like Mr. Harper could say that his lawyer promised him that he would get no worse than jail or probation and I decide to send him off to prison . . . .

Finally, just before Harper established the factual basis for his plea, the judge explained:

> . . . I could sentence you to go to jail, or I could sentence you to probation, or I could fine you up to 5,000 dollars, I can make you pay a bunch of court cost[s], I could even send you off to prison as long as four years, do you understand?

Harper responded: "Yes, sir."[58]

In contrast, the defendant in *Cunningham* did not have the same expectation under California's DSL. California's determinate scheme was

---

[58] The record in *Burns* does not contain a transcript of the plea hearing, but Burns does not contend that the trial judge failed to advise him of the five-year maximum prison sentence for attempted breaking and entering, as the judge was required to do under MCR 6.302(B)(2).

premised on a defendant's right to a fixed, middle term sentence. The DSL then permitted the judge, *after* conviction, to sentence a defendant to a higher or lower term based on judicial fact-finding.[59] Thus, upon conviction of continuous sexual abuse of a child, the *Cunningham* defendant had a legal entitlement to the statutory middle term of 12 years' imprisonment. The sentencing judge violated *Blakely* by sentencing him to 16 years on the basis of the judge's own findings.[60] Significantly, the Supreme Court of California attempted to justify its scheme based on its conclusion that, "'in operation and effect,' . . . the DSL 'simply authorize[s] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range.'" *Cunningham, supra,* 127 S Ct at 868, quoting *People v Black,* 35 Cal 4th 1238, 1254; 29 Cal Rptr 3d 740; 113 P3d 534 (2005), vacated sub nom *Black v California* ___ US ___; 127 S Ct 1210 (2007). The *Cunningham* Court rejected this reasoning, stating: "If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." *Cunningham, supra,* 127 S Ct at 869.

Michigan's scheme is inherently different from California's DSL, however, as we have explained. We need not attempt to invoke sentencing judges'

---

[59] *Cunningham, supra,* 127 S Ct at 861-862.

traditional discretion in order to avoid the plain language of our statute. Under the plain language of the DSL, the elements of the crime entitled a defendant to a presumptive middle term. Therefore, the DSL is like the hypothetical determinate system described in *Blakely* "that punishes burglary with a 10-year sentence, with another 30 added for use of a gun . . . ."[61] In such a system, "the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence . . . ."[62] Under the plain language of our sentencing scheme, on the other hand, Harper was entitled to the statutory maximum of four years' imprisonment when he pleaded guilty of larceny in a building, as he agreed he was fully aware, and Burns was entitled to the statutory maximum of five years' imprisonment when he pleaded guilty of attempted breaking and entering of a building. Thus, our system mirrors the *Blakely* Court's hypothetical indeterminate system "that says the judge may punish burglary with 10 to 40 years," and, therefore, under which "every burglar knows he is risking 40 years in jail."[63]

Our statutes clearly describe the range of intermediate options available to the sentencing judge, and the nature and effect of those options, when a defendant's minimum sentence range under the guidelines is in an intermediate

---

(…continued)

[60] *Id.,* 127 S Ct at 868.

[61] *Blakely*, *supra* at 309.

[62] *Id.*

[63] *Id.*

sanction cell. A defendant is not entitled to a circumscribed term of prison when he qualifies for an intermediate sanction, as was the case with the middle term prescribed by California's DSL. Rather, a Michigan defendant expects a range of possible sanctions, including jail and probation. He is also clearly aware that probation may be revoked—and that additional incarceration may therefore be imposed—at a hearing subject to a lower standard of proof than that required at trial. These clear expectations on the part of defendants are what cause us to reject Justice Kelly's contention that "[t]here is no meaningful difference between a Michigan court departing from an intermediate sanction cell and a California court imposing the upper term available under [the DSL]." *Post* at 14. A Michigan defendant is fully on notice that he *never* gains an entitlement to a mere 12 months in jail.

In sum, as is exemplified by these cases, Michigan's intermediate sanction cells are part of the legislative scheme for setting a minimum sentence that is tailored to the offender's history and the circumstances of the offense. The statutes governing a sentencing court's imposition of a minimum sentence never allow a judge to exceed the maximum sentence authorized by a jury verdict or a guilty plea. Even when a defendant's minimum sentence range is in an intermediate sanction cell, the Legislature made clear its intent that the sentencing judge retain the discretion to exceed the list of intermediate sanctions, and to

impose a minimum sentence of up to ⅔ of the statutory maximum, if an intermediate sanction is inappropriate in a given case.

When a defendant's minimum sentence range under the guidelines is in an intermediate sanction cell, the defendant has a *statutory right* to an intermediate sanction, *conditioned on the absence of substantial and compelling reasons to depart upward.*  Therefore, a defendant may appeal an upward departure on the basis of an alleged violation of this statutory right by arguing that the sentencing judge did not state on the record a legally sufficient substantial and compelling reason to depart.  But the defendant does not gain a *constitutional* right to an intermediate sanction under *Blakely.*  Indeed, the essence of defendants' arguments here is that *Blakely* entitles them to a sentence that is *less than* the maximum authorized by the jury verdict or the guilty plea.  But *Blakely,* which prohibits a judge from *exceeding* the maximum authorized by the jury verdict or the guilty plea, does not require this result.  Allowing judges to impose any sentence that is less than the authorized maximum does not implicate a defendant's Sixth Amendment rights because it does not usurp the jury's task of finding the facts that set the maximum sentence.  Thus, in the intermediate sanction cell context, because the defendant's sentence never exceeds the maximum sentence authorized by the jury verdict or the guilty plea, the sentencing judge may exercise his statutorily granted discretion to depart upward on the basis of facts not found by a jury.

In *Harper*, faced with intermediate options such as jail and probation, the sentencing judge observed several factors, including, most significantly, Harper's record of bench warrants, his three parole revocations, and his history of absconding from parole. These factors were not included in Harper's PRV score, and they certainly cast doubt on the appropriateness of a sentence that would again include probation. As a result, these factors alone constituted substantial and compelling reasons to sentence Harper to the jurisdiction of the Department of Corrections. Accordingly, we affirm Harper's sentence.

In *Burns*, the judge found substantial and compelling reasons to exceed the guidelines on the basis of Burns's admission to the officer that he had touched a young woman's buttocks and the uncontroverted testimony of two young women that Burns had harassed and intimidated them. This evidence was not considered in scoring the guidelines for Burns originally because it occurred after the judge had originally sentenced Burns to three years of probation. Burns's objective and verifiable behavior while on probation certainly provided substantial and compelling reasons to sentence Burns to the jurisdiction of the department of corrections rather than impose an intermediate sanction. Accordingly, we affirm Burns's sentence.

## C. HARMLESS ERROR UNDER *BLAKELY*

Finally, we find it important to note that *Blakely* errors are reviewed for harmless error. Accordingly, we add that even if an intermediate sanction is

41

construed as a maximum sentence for *Blakely* purposes, in each of these cases, if an error occurred, it was harmless beyond a reasonable doubt.

In *Washington v Recuenco,* ___ US ___; 126 S Ct 2546, 2553; 165 L Ed 2d 466 (2006), the United States Supreme Court ruled that *Blakely* errors are not structural, but are subject to harmless error analysis. The Court had already rejected the argument that failure to submit aggravating facts to a jury offends a "watershed" rule of criminal procedure, such that it undermines the fairness and accuracy of the overall proceeding, in *Schriro v Summerlin,* 542 US 348, 355-356; 124 S Ct 2519; 159 L Ed 2d 442 (2004) (holding that such errors do not offend any "watershed" rule of criminal procedure to the extent of requiring retroactive application). In *Schriro,* the Court explained that it could not "confidently say that judicial factfinding *seriously* diminishes accuracy." *Id.* at 356.

*Recuenco* compared *Blakely* errors to the error analyzed in *Neder v United States,* 527 US 1; 119 S Ct 1827; 144 L Ed 2d 35 (1999). *Neder* involved a jury trial for charges that included tax fraud.[64] One element of the offenses was the materiality of the fraudulent representation on the defendant's tax form. The trial court constitutionally erred when it failed to submit the question of materiality—as an element of the offense—to the jury and, instead, decided the issue itself.[65] The error was harmless, however, because uncontested facts presented at trial showed

---

[64] *Neder, supra* at 4.

that the misrepresentation—which consisted of the defendant's failure to report $5 million of income—was material. Indeed, the defendant did not suggest that he could introduce any contrary evidence, and he did not argue to the jury, or to the courts on appeal, that his false statements could be found immaterial.[66] Accordingly, the judge's conclusion that the element of materiality was proved was harmless beyond a reasonable doubt because no jury could reasonably find otherwise.[67] The Court summarized the analysis as follows: "In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Id.* at 17.

*Recuenco,* in turn, concluded that a similar analysis is appropriate if a trial court fails to submit sentencing factors to a jury, because there is no distinction, for Sixth Amendment purposes, between an element of an offense and a sentencing factor that increases a sentence beyond the sentence authorized by the elements of the offense.[68] The Washington Supreme Court had previously held

---

(…continued)

[65] *Id.*

[66] *Id.* at 15-16.

[67] *Id.* at 16.

[68] *Recuenco, supra,* 126 S Ct at 2552-2553.

that *Blakely* errors are structural.[69]  The *Recuenco* Court disagreed and remanded the case, directing the Washington courts to analyze whether the error was harmless.[70]

---

[69] *Id.,* 126 S Ct at 2550.

[70] *Id.,* 126 S Ct at 2553.  Justice Kelly's position would ultimately render *Blakely* errors in Michigan harmful per se because Michigan "has no process for criminal juries to make special findings of fact."  She states that "the procedural discussion in *Recuenco* suggests that the prosecution could not carry its burden in this case to prove the *Blakely* error harmless beyond a reasonable doubt."  *Post* at 25-26.  When the defendant posed this argument in *Recuenco,* the United States Supreme Court did not need to resolve the question.  Rather, the question before the Court was "whether *Blakely* error can ever be deemed harmless."  *Recuenco, supra,* 126 S Ct at 2550-2551.  Contrary to Justice Kelly's contention, it was unclear whether Washington "state law specifically allowed juries to make findings of fact."  *Post* at 26.  The high court left this question to the Washington courts on remand.  *Recuenco, supra,* 126 S Ct at 2550-2551.  In any event, the *Recuenco* Court questioned the defendant's interpretation of Washington law, observing that the Washington Court of Appeals had allowed juries to issue special verdicts on aggravating factors and the Washington Supreme Court had explicitly chosen not to establish a contrary rule in a case that did not squarely present the question.  *Id.,* 126 S Ct at 2550.

Similarly, Michigan law is not perfectly clear on this point.  Justice Kelly points to two nineteenth century cases in which this Court refused to allow the use of special questions in criminal cases because such questions "limit[] . . . the right of the jury to find a general verdict," *People v Roat,* 117 Mich 578, 583; 76 NW 91 (1898), and because the then-governing statutes did not clearly permit it, *People v Marion,* 29 Mich 31, 40-41 (1874).  We note that, more recently, Justice Levin observed, in his dissent in *People v Ramsey,* 422 Mich 500, 536; 375 NW2d 297 (1985), that many jurisdictions have concluded that not all use of special verdicts is error per se because specific findings of fact may be necessary to determine the nature of the conviction or the sentence.  Indeed, the Michigan Court of Appeals has implicitly condoned the use of special verdict forms enabling a jury to find a particular fact under some circumstances.  See *People v Matuszak,* 263 Mich App 42, 51; 687 NW2d 342 (2004); *People v Kiczenski*, 118 Mich App 341, 345; 324 NW2d 614 (1982).

(continued…)

44

## 1. *HARPER*

In *Harper*, defendant preserved the constitutional challenge to his sentence by raising this issue in a motion for resentencing before the circuit court. Thus, as in *Neder,* our review must consider whether the alleged error is harmless beyond a reasonable doubt.[71]

The sentencing judge here exceeded the list of intermediate sanctions, and imposed a prison sentence on the basis of facts contained in the presentence investigation report (PSIR). Contrary to Justice Kelly's contention that "Harper had no opportunity to present contrary evidence," *post* at 27, the judge permitted

_____

(…continued)

Most significantly, the *Recuenco* Court did not reach the question whether the unavailability of a particular procedure in the trial court necessarily renders all errors harmful, in essence transforming *Blakely* errors into structural errors for all defendants in a given state. As Justice Kelly ultimately concedes, at most *Recuenco* "advises [that] the lack of a procedure for special findings will increase the difficulty of the prosecution's burden to prove any error harmless beyond a reasonable doubt." *Post* at 26 n 18. Moreover, any conclusion on our part—based on dicta in *Recuenco*—that the lack of a procedure is alone dispositive would run counter to the crux of the harmless error analysis that forms the basis of the *Recuenco* Court's holding. The central question remains whether the facts used by a sentencing judge to support a sentence were "uncontested and supported by overwhelming evidence," such that a jury would have reached the same result. *Neder, supra* at 17. To illustrate, as we will explain further in parts III(C)(1) and (2) of this opinion, neither defendant in the cases before us seriously contends that a jury would have returned findings different from those of the sentencing judge, given the overwhelming evidence presented at each proceeding. Thus, even if the sentencing judges erred under *Blakely,* the errors in these cases would be precisely the sort of technical errors that do not require reversal under a harmless error analysis because they do not affect the substance or outcome of the proceedings.

[71] *Chapman v California,* 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967); *People v Shepherd,* 472 Mich 343; 697 NW2d 144 (2005).

45

Harper and his attorney to review the PSIR and to challenge the accuracy of its contents, as required by MCL 771.14(5) and (6). The judge also specifically explained to Harper the importance of noting inaccuracies, saying: "Now, sometimes they make mistakes on those reports and if they do it's important that you catch them, Mr. Harper, because we keep these reports for years and if there is a mistake now it could be used against you next year . . . ." Harper stated that he had read the PSIR. When asked if he saw any mistakes, he pointed out that a prior felony conviction had not been included, previously, when his attorney estimated his PRV score. He agreed that he understood that the felony was properly added, however, and stated: "I'm not contesting anything . . . ." Defense counsel also specifically indicated that "we ha[ve] reviewed this report, I have no additions, corrections or deletions to the report."[72]

Now, on appeal, Harper makes no claim that his record—of parole revocations, absconding from parole, bench warrants for failures to appear, and run-ins with law enforcement in other states—is inaccurate. During his oral

---

[72] We also note, first, that Michigan courts have long held that a sentencing court may presume that unchallenged facts contained in a PSIR are accurate. *People v Grant,* 455 Mich 221, 233-234; 565 NW2d 389 (1997). Second, we do not need to reach the question whether Harper effectively admitted the facts contained in the PSIR or waived his rights under *Blakely,* as is expressly permitted by the *Blakely* Court when a defendant pleads guilty. *Blakely, supra* at 310. In light of Harper's express agreement that no corrections to the PSIR were necessary, however, we note that, under many circumstances, a defendant waives a right—and, for purposes of review, *extinguishes* rather than merely forfeits

(continued…)

46

argument before this Court, he mounted a slight challenge to the sentencing judge's conclusion that he had "ripped off a charity that was trying to do good for cold children." He claimed that "[n]othing at the plea talked about stealing coats from children," adding that, although Old News Boys is a "charity that served needy people . . . , there's lots of different needy people adult and children . . . ." On this point, we simply note that, at the sentencing hearing, the president of Old News Boys explained that the organization served "needy children and families who are less fortunate."

Therefore, we conclude beyond a reasonable doubt that the facts used by the sentencing judge to support Harper's sentence were "uncontested and supported by overwhelming evidence," such that a jury would have reached the same result.[73] Indeed, like the defendant in *Neder,* Harper does not suggest that he would offer contrary evidence, particularly concerning the facts contained in his court records, if given the opportunity to do so.[74] Accordingly, if the judge is found to have violated *Blakely* at sentencing, any error is harmless beyond a reasonable doubt and does not require reversal.

_____

(…continued)
error—when the defendant affirmatively agrees to a course of action in the trial court. *People v Carter,* 462 Mich 206, 215; 612 NW2d 144 (2000).

[73] *Neder, supra* at 17.

[74] *Id.* at 15-16.

## 2. *BURNS*

Similarly, in *Burns*, we conclude that if any *Blakely* error is found to have occurred, it would be harmless beyond a reasonable doubt.[75] At sentencing on the probation violation, the judge relied on evidence presented at the probation violation hearing to conclude that substantial and compelling reasons existed to depart from the original guidelines sentence. At the hearing, defense counsel did not contest that his client had touched the young woman's buttocks, nor did he contest that his client had used alcohol in violation of his probation order. Burns himself admitted to the officer that the sexual touching had occurred and that he had consumed six beers. The defense presented no evidence and called no witnesses to contest these facts, despite having an opportunity to do so. We thus conclude beyond a reasonable doubt that the facts used by the sentencing judge to support Burns's sentence were "uncontested and supported by overwhelming evidence," such that a jury would have reached the same result.[76]

## IV. CONCLUSION

For these reasons, we reaffirm our holding in *Drohan* that Michigan has a true indeterminate sentencing system in which the statutory maximum is prescribed by law and in which the sentencing guidelines are used only to

---

[75] As in *Harper*, the defendant in *Burns* preserved the *Blakely* issue by raising it in a motion for resentencing. Thus, we review whether the alleged error is harmless beyond a reasonable doubt.

determine a defendant's minimum sentence. An intermediate sanction does not constitute a maximum sentence under *Blakely*; it bears no relation to the maximum sentence authorized by the jury verdict or the guilty plea. Rather, it establishes a statutory right to a cap on the defendant's period of incarceration, conditioned on the absence of substantial and compelling reasons to depart upward. Significantly, accepting defendants' arguments in these cases would require us to conclude that *Blakely* guarantees them a right to sentences that are *less than* those authorized by a jury verdict or guilty plea; to the contrary, *Blakely* prohibits a sentencing judge from *exceeding* the sentence authorized by the verdict or plea. Agreeing with defendants would also deprive intermediate sanctions such as probation of much of their intended effect. Finally, if any *Blakely* error is found to exist in either of these cases, we are convinced that any such errors were harmless beyond a reasonable doubt, given that the facts used by the sentencing judges were uncontested and supported by overwhelming evidence, such that a jury would have reached the same result. Accordingly, we affirm the defendants' convictions and sentences.

Maura D. Corrigan

---

(…continued)
[76] *Neder, supra* at 17.

Clifford W. Taylor
Elizabeth A. Weaver
Robert P. Young, Jr.
Stephen J. Markman

50

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 130988

BERNARD GEORGE HARPER, JR.,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 131898

JESSE GENE BURNS,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

      I concur with the result reached by the majority in *People v Harper*. Facts admitted by a defendant may be used by a trial court to determine the relevant statutory maximum. See *Blakely v Washington*, 542 US 296, 303; 124 S Ct 2531; 159 L Ed 2d 403 (2004). In light of the guidance and admonitions given by the trial court, I believe that defendant Harper admitted to the facts used by the trial court to sentence defendant when he pleaded guilty and stated that he did not contest the information in the presentence investigation report.

Moreover, I concur with the result advocated by Justice Kelly in her dissent in *People v Burns*. I agree that the trial court did not articulate substantial and compelling reasons to depart from the sentencing guidelines. See *People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003). Thus, this case should be remanded for resentencing. Because the trial court did not comply with the requirements for sentencing and this case can be decided on statutory grounds, it is improper to address the constitutional issue decided by the majority.

Michael F. Cavanagh

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                No. 130988

BERNARD GEORGE HARPER, JR.,

        Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                No. 131898

JESSE  GENE BURNS,

        Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

The Court heard oral argument in these cases along with *People v McCuller*, which was on remand to us from the United States Supreme Court. *Michigan v McCuller*, __ US ___; 127 S Ct 1247 (2007). My dissenting opinion in *McCuller* contains my most thorough analysis of the application of the Sixth

Amendment[1] to the Michigan sentencing guidelines.[2] *People v McCuller*, 479

Mich ___; ___ NW2d ___ (Docket No. 128161, decided July 26, 2007).  For a full

understanding of the issues involved, I urge the reader to turn to my dissent in that

case.

With respect to *Burns*, this Court should not even reach the constitutional

issue.  The trial court failed to articulate substantial and compelling reasons to

exceed the range set by the sentencing guidelines.  Because of this, defendant

Jesse Burns is entitled to resentencing, irrespective of the constitutional issue.

In *Harper*, the majority continues to exempt Michigan from the Sixth

Amendment precedent set by the United States Supreme Court in *Jones v United*

*States*[3] and its progeny.  However, it is clear to me that the judicial fact-finding

that took place in *Harper* violated Bernard Harper's Sixth Amendment right to a

trial by jury.  In fact, the violation is even clearer than the violation in *McCuller*.

Michigan's sentencing guidelines are unconstitutional as applied.  I would vacate

---

[1] The Sixth Amendment of the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.  [US Const, Am VI.]

[2] MCL 777.1 *et seq.*

2

the sentence and remand the case to the trial court for resentencing in a manner that conforms to the Sixth Amendment.

## I. *PEOPLE V BURNS*

### A. PROCEDURAL FACTS

In July 2002, Burns pleaded guilty of attempted breaking and entering. MCL 750.110; MCL 750.92. It is undisputed that the guidelines range for his minimum sentence was zero to 11 months. This range falls in what is properly referred to as an intermediate sanction cell. MCL 769.34(4)(a) creates these cells. It provides:

> If the upper limit of the recommended minimum sentence range for a defendant determined under the sentencing guidelines set forth in chapter XVII is 18 months or less, the court shall impose an intermediate sanction unless the court states on the record a substantial and compelling reason to sentence the individual to the jurisdiction of the department of corrections. An intermediate sanction may include a jail term that does not exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less.

Pursuant to MCL 769.31(b), one possible intermediate sanction is probation. The trial court in this case chose that option and sentenced Burns to three years' probation.

In 2005, the court found, by a preponderance of the evidence, that Burns had violated his probation. At sentencing, the court noted that the original range

---

(…continued)
[3] 526 US 227; 119 S Ct 1215; 143 L Ed 2d 311 (1999).

had been zero to 11 months.[4]  But it decided to exceed the range given in the intermediate sanction cell and not impose an intermediate sanction.  It sentenced Burns to 1 1/2 to five years in prison.

Because the court did not impose an intermediate sanction as a sentence, it had to articulate a substantial and compelling reason for the departure.  MCL 769.34(4)(a).  The court completed a sentencing information report departure evaluation form stating its reason:

> The original SGL of 0-11months [sic] fails to consider his violation behavior—which constitutes a substantial and compelling reason for a moderate departure from this range.

No additional reasons were given.

## B. Substantial and Compelling Reasons for the Guidelines Departure

The trial court's statement in support of its departure does not constitute a substantial and compelling reason to exceed the sentencing guidelines range.

> The phrase "substantial and compelling reason" has, in our judgment, acquired a peculiar and appropriate meaning in the law and, thus, it must be construed according to such meaning.  That is, a "substantial and compelling reason" must be construed to mean an "objective and verifiable" reason that "'keenly' or 'irresistibly' grabs our attention"; is "of 'considerable worth' in deciding the length of a sentence"; and "exists only in exceptional cases."  [*People v Babcock*, 469 Mich 247, 257-258; 666 NW2d 231 (2003), quoting *People v Fields*, 448 Mich 58, 62, 67-68; 528 NW2d 176 (1995).]

---

[4] The sentencing court is required to apply the sentencing guidelines when sentencing after a probation violation.  *People v Hendrick*, 472 Mich 555, 560; 697 NW2d 511 (2005).

4

Whether a reason for departure is objective and verifiable is a question of law subject to review de novo. *Babcock*, 469 Mich at 265.

In this case, the court relied solely on Burns's postprobation conduct to exceed the guidelines range. A sentencing court may consider postprobation conduct when determining whether substantial and compelling reasons exist to depart upward. But the fact that probation was violated does not automatically constitute a substantial and compelling reason. *People v Hendrick*, 472 Mich 555, 562-563; 697 NW2d 511 (2005). The trial court's statement on the departure evaluation form does not satisfy *Hendrick*'s requirement.

By simply referring to Burns's "violation behavior," the court did nothing more than repeat the fact that Burns had violated the terms of his probation. The statement did not explain why his behavior separated Burns from the typical probation violator. It did not explain why this particular departure was warranted, or why this is an "exceptional case[]" warranting a departure. *Babcock*, 469 Mich at 258. And it said nothing about why this case should "keenly or irresistibly" seize our attention. *Id*. Without such detail, the stated reason for departure is insufficient. *Id*.; *Hendrick*, 472 Mich at 563. And *Burns* must be remanded to the trial court for resentencing. MCL 769.34(11).

The majority turns to the sentencing transcript to bolster the trial court's stated reason for departure. This is inappropriate. A reviewing court may not search the record to find its own substantial and compelling reason to depart.

5

Instead, it must rely on the reasons stated by the trial court. If they are insufficient, the review must end there, and the case must be remanded for resentencing. *Babcock*, 469 Mich at 273 (appendix to majority opinion).

But even if we were to refer to the sentencing transcript, a substantial and compelling reason justifying the departure cannot be found. The only statement in the record that might constitute a reason for departure is the following statement by the court:

> I seldom ever exceed guidelines, in fact I can't recall a time that I have, but I'm going to in your case. The behavior that you exhibited here certainly is not or was not contemplated in arriving at your original guidelines. It was gross, it was abusive, and I believe there's a compelling reason to exceed guidelines.

One could infer from this that the court intended to depart because Burns's behavior was "gross" and "abusive."

These are subjective words. Whether conduct is "gross" and "abusive" is a determination that changes depending on who is reviewing it. It could vary drastically according to a person's culture, upbringing, religion, and education. Because of its subjective nature, a finding that actions were "gross" and "abusive" cannot be a substantial and compelling reason to depart from the sentencing guidelines. *Babcock*, 469 Mich at 257-258. Burns must be resentenced. MCL 769.34(11).[5]

---

[5] The Michigan Department of Corrections paroled Burns on November 14, 2006. But the parole does not render moot the discussion of his sentence. Burns

(continued…)

Therefore, no need exists to reach the Sixth Amendment question in this case. It is a well-accepted rule that an appellate court will not grapple with a constitutional issue if a case can be decided on other grounds. *J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722, 734; 664 NW2d 728 (2003); *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993). The majority disregards this rule without providing its reason. At the very least, the majority should have addressed the *Babcock* issue before undertaking the application of *Blakely v Washington*[6] here. If it had done so, the constitutional issue could have been avoided entirely.[7]

---

(…continued)
remains under supervision until November 14, 2007. See Offender Tracking Information System, available at <http://www.state.mi.us/mdoc/asp/otis2profile.asp?mdocNumber=414793> (accessed June 28, 2007). Until that date, he faces the potential of parole revocation and could be returned to prison for the remainder of his five-year maximum sentence. Were the Court to order him resentenced, however, and were the trial court to impose the intermediate sanction cell maximum sentence of 11 months in jail, Burns would be released from supervision. And he would not face the potential of returning to prison.

[6] 542 US 296; 124 S Ct 2531; 159 L Ed 2d 403 (2004).

[7] Because I find that no substantial and compelling reason to depart was articulated in this case, I need not address whether the court's departure violated the Sixth Amendment. But I note that my analysis from *McCuller*, 479 Mich at ___, and my discussion of *Harper* here would apply equally to *Burns* had the trial court found appropriate reasons to depart. Therefore, if the reasons stated to depart had been objective and verifiable, I would have remanded the case for resentencing because of the *Blakely* violation.

7

## II.  *PEOPLE V HARPER*

### A.  PROCEDURAL FACTS

Harper pleaded guilty of larceny in a building under MCL 750.360, which provides:

> Any person who shall commit the crime of larceny by stealing in any dwelling house, house trailer, office, store, gasoline service station, shop, warehouse, mill, factory, hotel, school, barn, granary, ship, boat, vessel, church, house of worship, locker room or any building used by the public shall be guilty of a felony.

This is a class G offense with an absolute maximum sentence of four years in prison.  MCL 750.503; MCL 777.16r.

Before imposing sentence, the trial court calculated a score for both the prior record variables (PRVs) and the offense variables (OVs).  It scored 50 points for PRV 1 because of defendant's two prior high-severity felony convictions.  MCL 777.51(1)(b).  It scored 20 points for PRV 2 because of defendant's three prior low-severity felony convictions.  MCL 777.52(1)(b).  And it scored 2 points for PRV 5 because of defendant's prior misdemeanor conviction.  MCL 777.55(1)(e).  The court also scored 5 points for OV 16.  To do so, it made a finding of fact using a preponderance of the evidence standard.  It found that the stolen property in question "had a value of $1,000.00 or more but not more than $20,000.00."  MCL 777.46(1)(c).  Harper did not admit the value of the stolen property.

8

MCL 777.68 sets forth the class G sentencing grid. On this grid, a PRV level of 72 points and an OV level of 5 points converge in cell E-I. This cell provides a minimum sentence range of zero to 17 months. MCL 777.68. Had the trial court not scored 5 points for OV 16, Harper's OV level would have been zero points. This would not have changed his minimum sentence range under the guidelines. A PRV level of 72 points and an OV level of zero points still converge in cell E-I. MCL 777.68. Because the judicial findings necessary to score OV 16 did not change the range, they are immaterial to this case.

In light of the fact that the top end of the guidelines range is less than 18 months, Harper's minimum sentence range is in an intermediate sanction cell. This means that his sentence must not exceed 12 months in jail, absent substantial and compelling reasons to depart. MCL 769.34(4)(a). The trial court imposed a sentence of 24 to 48 months in prison.[8] It prepared a sentencing information report departure evaluation form stating its reasons for the upward departure:

---

[8] The Michigan Department of Corrections paroled Harper on February 14, 2007. The parole does not make discussion of his sentence moot. He remains under supervision until August 14, 2008. See Offender Tracking Information System, available at <http://www.state.mi.us/mdoc/asp/otis2profile.asp?mdocNumber=358848> (accessed June 28, 2007). On resentencing, were the trial court to impose the intermediate sanction cell maximum sentence of 12 months in jail, Harper would be released from supervision immediately, with no potential of returning to prison.

Guidelines do not include at least 3 parole revocations, abscondings from probation, Bench warrants from various courts and stealing from a charity that serves freezing children[.]

B. SUBSTANTIAL AND COMPELLING REASONS FOR THE UPWARD DEPARTURE

In this case, the reasons stated for departure survive review under *Babcock*. The parole revocations, the abscondings from probation, and the bench warrants could be objectively verified using court files and the records of the Department of Corrections. These facts were of "considerable worth" in determining Harper's sentence because they demonstrated a pattern of failing to meet legally imposed expectations and minimum societal behavioral requirements. Therefore, they provided substantial and compelling reasons to exceed an intermediate sanction at sentencing. *Babcock*, 469 Mich at 257-258.

The final stated reason, "stealing from a charity that serves freezing children," was also substantial and compelling. It is undisputed that Harper stole from the Old Newsboys, a charity associated with Goodfellows. While the "freezing children" comment could be viewed as hyperbole, it is undisputed that the charity is dedicated to helping needy families and children. One of its missions is to provide winter coats. Because of this, I would find that the final reason for departure was objective and verifiable. The fact that Harper stole from a charity was of considerable importance at sentencing, given that it distinguished him from the typical defendant. Because of this, it also satisfied the requirements of *Babcock*. *Id.*

10

The trial court complied with the sentencing guidelines requirements and stated substantial and compelling reasons to depart from an intermediate sanction. The discussion now must turn to the constitutionality of doing so.

## C. *BLAKELY*'S BRIGHT-LINE RULE

As I explain in *McCuller*,[9] the United States Supreme Court has articulated a bright-line rule for Sixth Amendment analysis:

> Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [*Cunningham v California*, 549 US __; 127 S Ct 856, 868; 166 L Ed 2d 856 (2007), quoting *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000).]

The "statutory maximum" sentence is not always the absolute maximum sentence set by statute.

> The dispositive question, we said, "is one not of form, but of effect." If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. A defendant may not be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." [*Ring v Arizona*, 536 US 584, 602; 122 S Ct 2428; 153 L Ed 2d 556 (2002), quoting *Apprendi*, 530 US at 483, 494 (citations omitted; emphasis in *Apprendi*).]

Therefore, the statutory maximum sentence for Sixth Amendment purposes is the maximum sentence permissible based on the jury's verdict, the defendant's

---

[9] 479 Mich at ___ (Kelly, J., dissenting).

11

prior criminal record, and any admissions that the defendant made. It is irrelevant that the trial court could have found additional facts that could have increased the sentence. *Blakely v Washington*, 542 US 296, 303-304; 124 S Ct 2531; 159 L Ed 2d 403 (2004). This rule is necessary to properly protect the people's control of the judiciary, as intended by the Framers of the United States Constitution. *Id.* at 313.

When a defendant is entitled to a sentence that is within the range specified in an intermediate sanction cell, MCL 769.34(4)(a) sets his or her maximum sentence. That maximum sentence is a jail term of either the upper limit of the recommended minimum sentence range or 12 months, whichever is shorter. Under the guidelines statutes, the court may not exceed this maximum sentence, unless it can state substantial and compelling reasons to do so. MCL 769.34(4)(a). Therefore, unlike a typical sentencing in Michigan, the process no longer is concerned with the defendant's minimum sentence. Under the Supreme Court's bright-line rule, this alteration in focus changes what has become known as the defendant's "statutory maximum."

The new maximum sentence established under MCL 769.34(4)(a) is the defendant's "statutory maximum." This is true because it is the longest sentence that the court can give a defendant solely on the basis of the defendant's criminal record and admissions and the jury's verdict. *Cunningham*, 127 S Ct at 868; *United States v Booker*, 543 US 220, 244; 125 S Ct 738; 160 L Ed 2d 621 (2005);

12

*Blakely*, 542 US at 301; *Apprendi*, 530 US at 490; *Jones*, 526 US at 251-252. The effect of making findings of fact that move the sentence to a higher statutory maximum is that the defendant faces either (1) a different criminal charge or (2) the increased stigma of an extended sentence. This is specifically what the Supreme Court sought to avoid. *Apprendi*, 530 US at 484. Any judicial fact-finding that lifts the defendant's sentence above the statutory maximum is unconstitutional and violates *Jones* and its progeny.

### D. WHY HARPER'S SENTENCE VIOLATES THE SIXTH AMENDMENT

As I explain in *McCuller*,[10] scoring the OVs can violate *Blakely*'s bright-line rule. The violation in *Harper* is particularly clear. Harper's case closely mirrors the situation in *Cunningham*. California's determinate sentencing law (DSL) created a three-tiered sentencing system for most crimes. The statute defining Cunningham's offense provided a lower, a middle, and an upper sentence. The California Penal Code mandated that the trial court impose the middle term, unless circumstances existed that mitigated or aggravated the offense. *Cunningham*, 127 S Ct at 861-863. The Supreme Court paid special attention to the fact that a defendant in California was entitled to the middle sentence unless the sentencing court made additional findings of fact:

> California's DSL, we note in this context, resembles pre-*Booker* federal sentencing in the same ways Washington's sentencing system did: The key California Penal Code provision

---

[10] 479 Mich at ___ (Kelly, J., dissenting).

states that the sentencing court "*shall order* imposition of the middle term" absent "circumstances in aggravation or mitigation of the crime," [Cal Penal Code] 1170(b) (emphasis added), and any move to the upper or lower term must be justified by "a concise statement of *the ultimate facts*" on which the departure rests, [Cal Ct R] 4.420(e) (emphasis added). [*Cunningham*, 127 S Ct at 866 n 10 (emphasis in original).]

MCL 769.34(4)(a) contains similar mandatory language: "[T]he court *shall impose* an intermediate sanction unless the court states on the record a substantial and compelling reason to sentence the individual to the jurisdiction of the department of corrections." (Emphasis added.) Therefore, just like a defendant in California, a defendant in Michigan is entitled to an intermediate sanction cell sentence. And the court is authorized to depart from the sentence only through judicial fact-finding after the jury verdict. As in California, these findings of fact need be based only on a preponderance of the evidence.

Hence, as in the California scheme, a sentence resulting from an intermediate sanction cell in Michigan constitutes a "statutory maximum" for purposes of *Apprendi*. *Cunningham*, 127 S Ct at 868. There is no meaningful difference between a Michigan court departing from an intermediate sanction cell and a California court imposing the upper term available under that state's penal code. It follows that reversal is mandated in this case.

The majority effectively attempts to rewrite MCL 769.34(4)(a) to make it provide for no more than a minimum sentence. As I explain in *McCuller,* the attempt falls short of its goal. The language of the statute is not ambiguous. "An

14

intermediate sanction may include a jail term that *does not exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less*." MCL 769.34(4)(a) (emphasis added).  The statute mandates that the sentencing court impose an intermediate sanction when a defendant falls into an appropriate cell, unless the court makes judicial findings of fact to support a departure.  MCL 769.34(4)(a).  It also defines the upper limit of an intermediate sanction cell sentence:  12 months in jail.  Because this is the highest sentence a defendant may face, it is, in every sense, a maximum sentence.  Absent judicial fact-finding, the trial court has no power to impose even a 13-month sentence.  At most, Harper should have faced 12 months in jail.  MCL 769.34(4)(a).[11]

The majority tries to change this fact by turning to MCL 769.8(1).  MCL 769.8(1) states that there are cases in which the sentencing court will not fix the minimum sentence and in which the absolute maximum sentence will not apply.  It notes that other provisions in that chapter of the Code of Criminal Procedure state the exceptions to the general rule.  MCL 769.34 is in the same chapter.  And MCL 769.34(4)(a) provides that the sentencing court sets the maximum sentence.  Therefore, these statutes, read together, show that intermediate sanction cells do

---

[11] The majority claims that a Michigan defendant is liable to serve the absolute maximum sentence in every case.  See *ante* at 14 n 25.  MCL 769.34(4)(a) shows the fallacy of this point.  Some Michigan defendants face no higher maximum than 12 months in jail, even though a second, higher statutory maximum sentence exists for their crime.  This undeniable fact destroys the majority's premise that Michigan has only one maximum sentence for each crime.

not merely set minimum sentences. The Legislature intended that intermediate sanction cells set maximum sentences. MCL 769.34(4)(a); MCL 769.8(1). This Court has no right to change this fact.

Hence, there are two possible maximum sentences for the offense in question, the absolute statutory maximum and the intermediate sanction cell statutory maximum. A defendant is entitled to whichever one is supported by his or her conviction, admissions, and criminal record. "[A]nd by reason of the Sixth Amendment [any additional] facts bearing upon that entitlement must be found by a jury." *Blakely*, 542 US at 309. Therefore, if other facts are used to move the defendant to the higher of the two maximum sentences, they must be proved to the jury beyond a reasonable doubt.

E. MICHIGAN'S MIXED DETERMINATE—INDETERMINATE SENTENCING SCHEME

The majority attempts to justify its conclusion in this case by claiming that Michigan has a traditional indeterminate sentencing scheme. See *id*. at 308-309. The United States Supreme Court has noted that such schemes do not violate the Sixth Amendment. But because intermediate sanction cells set maximum sentences, Michigan's sentencing scheme is distinct from the traditional indeterminate scheme. For Sixth Amendment purposes, it is properly viewed as a mixed determinate/indeterminate sentencing scheme. This is because, as discussed in *Blakely*, a traditional indeterminate scheme can have only one maximum sentence. *Id*. at 308-309. The fact that Michigan's scheme is different

16

in this way mandates that it be treated differently. Again, this makes Michigan's system strikingly similar to California's system, which the Supreme Court found unconstitutional in *Cunningham*.

As I discuss in *McCuller*, the majority also attempts to distinguish the Michigan system from a wholly determinate scheme by noting that one possible intermediate sanction is probation. MCL 769.31(b). To support its argument, the majority relies on the federal probation system. But Michigan's probation system differs greatly from the federal system. Whereas the federal system imposes a new sentence after a probation violation, the Michigan system merely directs resentencing using the original sentencing guidelines. See *United States v Goffi*, 446 F3d 319, 322 (CA 2, 2006), and *Hendrick*, 472 Mich at 560. Because the same guidelines apply before and after a probation violation in this state, *Blakely* continues to apply after a probation revocation. This completely undermines the majority's argument that intermediate sanction cells set only minimum sanctions.[12]

The Court of Appeals for the Second Circuit explained why *Blakely* does not apply to sentencing after a federal probation violation:

> The statutory scheme thus requires a sentencing court to consider a variety of factors, including the non-binding policy statements applicable to probation violations, in determining an

---

[12] Further undermining the majority's theory is the fact that intermediate sanction cell sentences are treated as maximum sentences in Michigan. When a defendant receives only an intermediate sanction jail sentence, he or she faces that sentence and nothing more. The defendant is not reevaluated after completing the sentence to see if prison time is required. Rather, the defendant is set free.

appropriate sentence. *Nowhere, however, does it require a court to sentence within the Guidelines range for the underlying conviction in determining punishment for separate and distinct malfeasance by the defendant—violation of probation. . . . United States v. Pena*, 125 F.3d 285, 287 (5th Cir.1997). ("Because there are no guidelines for sentencing on revocation of probation, and because the district court was not limited to the sentencing range available at the time of the initial sentence, we find no error in the trial court's failure to employ the analysis normally required in departure case[s].") . . . . [*Goffi*, 446 F3d at 322-323 (emphasis added).]

The exact opposite is true in Michigan. The guidelines continue to apply to a Michigan defendant. *Hendrick*, 472 Mich at 560. The sentencing court is limited to the sentence range available at the time of the initial sentence. And the probation violation is not treated as a separate malfeasance in Michigan. *People v Kaczmarek*, 464 Mich 478, 483-484; 628 NW2d 484 (2001).

These fundamental differences between the Michigan system and the federal system mandate different results when *Blakely*'s bright-line rule is applied. Because none of the factors relied on by the federal courts exists in Michigan, *Blakely* continues to apply after probation revocation in Michigan. This completely undermines the majority's argument that, because of the possibility of probation as an intermediate sanction, intermediate sanction cells produce a minimum sentence rather than a maximum sentence.[13]

---

[13] The majority simply disregards the reasoning of *Goffi* and *Pena*. And in doing so, it disregards the distinctions between the two systems. In fact, the two systems differ greatly. In the federal system, a court no longer sentences under the guidelines, probation is viewed as a distinct malfeasance, and the former statutory maximum no longer applies. *Goffi,* 446 F3d at 322-323; *Pena*, 125 F.3d at 287. In

(continued…)

18

The majority further argues that intermediate sanctions must be minimum sentences because a defendant subject to them can be given a sentence of probation with jail. It argues that recognizing that intermediate sanction cell sentences are statutory maximum sentences will limit the effectiveness of imposing such sentences. Although it is true that MCL 769.31(b)(*iv*) allows for intermediate sanction cell sentences that include both probation and jail, the majority's reliance on this point is irrelevant.

The Legislature has determined that a sentence of 12 months in jail is an appropriate statutory maximum sentence for defendants who merit an intermediate sanction.[14] Our constitution vests the Legislature with the ultimate authority to set criminal penalties. Const 1963, art 4, § 45; *People v Hegwood*, 465 Mich 432, 436; 636 NW2d 127 (2001). The Legislature inserted the 12-month limit on jail sentences in MCL 769.34(4)(a). Only the Legislature, not this Court, may increase this limit. Someone who believes that the 12-month cap is insufficient can petition the Legislature to amend the statute. But the Court cannot ignore the

---

(…continued)
Michigan, probation is not a separate offense, the guidelines still apply, and the defendant remains subject to the statutory maximum sentence created by MCL 769.34(4)(a). Therefore, unlike the federal system, the Michigan system is still subject to the *Blakely* bright-line rule after a defendant violates probation.

[14] "An intermediate sanction may include a jail term that does not exceed the upper limit of the recommended minimum sentence range or 12 months, whichever is less." MCL 769.34(4)(a).

statutory maximum sentence and a defendant's Sixth Amendment rights because it finds the statutory penalty insufficient.

For example, those who believe that 12 months is insufficient incarceration to punish probation violators could petition the Legislature to change Michigan's probation system to mimic the federal system. The Legislature could follow the lead of *Goffi* and treat a probation violation as a separate malfeasance. It could make probation violation subject, not to the guidelines for the underlying offense, but to independent punishment. See *Goffi,* 446 F3d at 322-323; *Pena*, 125 F3d at 287. If the Legislature effected such a change, it could eliminate the Sixth Amendment violation now lurking in the Michigan system. But, again, this decision must be left to the Legislature.

Ultimately, and most importantly, the majority cannot disregard the Sixth Amendment simply because it is convenient for purposes of the status quo or because it comports with legislative intent. *Blakely* specifically rejected any such approach:

> Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a

20

jury all facts legally essential to the punishment. [*Blakely*, 542 US at 313 (emphasis in original).]

It might be easier to continue the current modus operandi:  to punish probation violators by allowing judges to increase their statutory maximum sentence by using findings of fact not supported by the violators' prior record or admissions or the jury's verdict.   But the Sixth Amendment does not allow courts to disregard defendants' rights just because to make a correction would require the judicial system to undergo change. *Id*.

The majority is also incorrect in relying on its belief that the Legislature intended that probation violators be punished with more than 12 months in jail. Even if the Legislature intended that punishment, it is irrelevant.  This fact is made obvious by the decision in *Ring*.  The Arizona legislature intended that a sentence of death should be imposed in first-degree murder cases in which aggravating factors existed. *Ring*, 536 US at 592-593.  But the Supreme Court found that this intent could not be effectuated in light of the Sixth Amendment.  Notwithstanding the Arizona legislature's intent, the judicial fact-finding that increased Ring's maximum sentence to the death penalty violated *Blakely*'s bright-line rule:  "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id*. at 602.

Moreover, the proper application of the Sixth Amendment to Michigan's intermediate sanction cells need not weaken an intermediate sanction cell sentence

of probation with jail.  The system easily could be made to comply with *Blakely*.

For example, this Court could amend our court rules to provide for a jury to be

impaneled after a court found a probation violation.  If the jury then found beyond

a reasonable doubt the facts necessary to move the defendant from an intermediate

sanction cell, there would be no Sixth Amendment violation.  Therefore, Michigan

could both retain its current probation system and protect a defendant's

constitutional rights.[15]

The majority contends that the imposition of an intermediate sanction cell

sentence does not affect the absolute maximum statutory sentence.  It reasons that

a defendant is not entitled to an intermediate sanction cell sentence until after the

court decides that substantial and compelling reasons to depart from it do not

exist.  Therefore, it reasons, there is only one statutory maximum sentence.  But

the Supreme Court heard and rejected a similar argument in *Ring*.  There the

pertinent statute directed the judge to conduct a separate sentencing hearing.  The

purpose of the hearing was to enable the judge to determine the existence of

specified circumstances in order to decide which to impose, the death penalty or

life imprisonment.  *Ring*, 536 US at 592-593.  But the Supreme Court concluded

that the fact that the judge could impose a higher sentence under the sentencing

scheme is not relevant.  A defendant is *entitled* to a sentence based solely on the

---

[15]  For a complete discussion of the appropriate remedy for the
constitutional violation occurring in these cases, please see my dissenting opinion
(continued…)

22

jury's verdict and the defendant's admissions and criminal history. The Supreme

Court explained:

> In an effort to reconcile its capital sentencing system with the
> Sixth Amendment as interpreted by *Apprendi*, Arizona first restates
> the *Apprendi* majority's portrayal of Arizona's system: Ring was
> convicted of first-degree murder, for which Arizona law specifies
> "death or life imprisonment" as the only sentencing options, see
> Ariz. Rev. Stat. Ann. § 13-1105(C) (West 2001); Ring was therefore
> sentenced within the range of punishment authorized by the jury
> verdict. See Brief for Respondent 9-19. This argument overlooks
> *Apprendi*'s instruction that "the relevant inquiry is one not of form,
> but of effect." 530 U.S., at 494. In effect, "the required finding [of
> an aggravated circumstance] expose[d] [Ring] to a greater
> punishment than that authorized by the jury's guilty verdict." *Ibid.*;
> see 200 Ariz., at 279, 25 P. 3d, at 1151. The Arizona first-degree
> murder statute "authorizes a maximum penalty of death only in a
> formal sense," *Apprendi*, 530 U.S., at 541 (O'Connor, J.,
> dissenting), for it explicitly cross-references the statutory provision
> requiring the finding of an aggravating circumstance before
> imposition of the death penalty. See [Ariz Rev Stat Ann] 13-1105(C)
> ("First degree murder is a class 1 felony and is punishable by death
> or life imprisonment *as provided by* [Ariz Rev Stat Ann] *13-703*."
> (emphasis added)). If Arizona prevailed on its opening argument,
> *Apprendi* would be reduced to a "meaningless and formalistic" rule
> of statutory drafting. [*Id.* at 603-604.]

The Supreme Court made clear that the majority's argument in this case

must fail. The Arizona court in *Ring* was imposing a statutory maximum sentence

by sentencing the defendant to a life sentence rather than the death penalty.

Similarly, a Michigan court imposes a statutory maximum sentence when

sentencing a defendant to an intermediate sanction cell sentence rather than to the

---

(…continued)
in *People v McCuller*, 475 Mich 176, 208-213; 715 NW2d 798 (2006).

23

absolute maximum sentence. Both systems set statutory maximum sentences. And, in both situations, judicial fact-finding by the sentencing court increasing this sentence violates the Sixth Amendment, no matter what formalistic gloss is placed on the fact-finding.[16]

In summary, Michigan's intermediate sanction cells set maximum sentences. They can be increased only through judicial fact-finding after the jury's verdict. Because of this fact, intermediate sanction cell sentences equate to the middle term of California's DSL system. *Cunningham*, 127 S Ct at 868. Both constitute a statutory maximum sentence for *Apprendi* purposes.

In this case, but for the trial court's findings of fact made using a preponderance of the evidence standard, Harper would have received an intermediate sanction. The highest valid sentence he would have faced was 12 months in jail. MCL 769.34(4)(a). The sentence he received was four years in

---

[16] The majority attempts to distinguish *Ring* by focusing on the fact that the sentence of death in that case could be imposed only if the judge found aggravating circumstances. *Ante* at 14 n 25. It concludes that this distinguishes Arizona's sentencing scheme from Michigan's sentencing guidelines because, it postulates, only one maximum sentence exists in Michigan. As I explain both here and in *McCuller*, this is simply inaccurate. Just as in *Ring*, a defendant in Michigan who falls in an intermediate sanction cell faces one maximum sentence (12 months in jail) unless the court makes findings of fact that move him or her out of that cell. Whether these findings are called an identification of aggravating circumstances, a scoring of OVs, or a departure from the guidelines, one fact remains the same: the trial court is engaging in activity that increases the defendant's sentence by making findings not supported by the jury's verdict, the defendant's admissions, or the defendant's past convictions. This violates *Blakely*'s bright-line rule.

prison.    This violated the Sixth Amendment, and the violation requires resentencing.

## E.  HARMLESS ERROR

The Supreme Court concluded that *Blakely* errors are not structural errors requiring automatic reversal.  *Washington v Recuenco*, __ US __; 126 S Ct 2546, 2553; 165 L Ed 2d 466 (2006).  The Court reasoned that sentencing factors were equivalent to the elements of the crime.  Both must be proved to a jury beyond a reasonable doubt.  *Id*. at 2552.  The appropriate standard of review for this constitutional issue is whether the omission of an element of the offense was harmless beyond a reasonable doubt.  *Neder v United States*, 527 US 1, 18-19; 119 S Ct 1827; 144 L Ed 2d 35 (1999).

Michigan has no process for criminal juries to make special findings of fact.  See MCR 6.420.  This procedural problem is no small issue.  In *Recuenco,* the United States Supreme Court considered the consequences of there being no procedure by which a jury could have made a finding.  It suggested that a defendant would be more likely to demonstrate successfully that the *Blakely* violation was not harmless in such a situation.  *Recuenco*, 126 S Ct at 2550.  This case evidences the procedural problem noted in *Recuenco*.

The jury convicted Recuenco of second-degree assault on the basis of its finding that he had assaulted his wife with a deadly weapon.  *Id*. at 2549.  He objected to the judicial finding that was made after the verdict that the deadly

25

weapon was a firearm. *Id*. Thus, in *Recuenco*, state law specifically allowed juries to make findings of fact. And the fact used by the judge in sentencing closely related to the fact found by the jury.

In this case, no procedure was available for the jury to make special findings. The United States Supreme Court has not addressed the application of a harmless error analysis to *Blakely* questions in such situations. But the procedural discussion in *Recuenco* suggests that the prosecution could not carry its burden in this case to prove the *Blakely* error harmless beyond a reasonable doubt. See *id*. at 2550.[17] At the very least, it is not clear that the jury's verdict would have been the same as the trial court's findings. Therefore, the error was not harmless. *Neder*, 527 US at 18-19.[18]

---

[17] The majority apparently misses the point of why the Supreme Court indicated that the lack of procedure would increase the difficulty in proving the error harmless. Simply, if the jury has no means of making the finding, how can a reviewing court presume that the jury would have made that finding regardless of the prohibition against it?

[18] The majority accuses me of effectively concluding that all *Blakely* errors are "harmful per se." *Ante* at 44 n 70. This is inaccurate. I acknowledge that the Blakely error in *Recuenco* was not harmful per se. But when I apply the words of the United States Supreme Court, it is not clear to me that *Blakely* errors in Michigan may be harmless beyond a reasonable doubt. This is because, as the Supreme Court advises, the lack of a procedure for special findings will increase the difficulty of the prosecution's burden to prove any error harmless beyond a reasonable doubt. And Michigan lacks a procedure.

As I discuss at length in *McCuller*, 479 Mich at ___ (Kelly, J., dissenting), the majority also misstates the law regarding the ability of a jury to make special findings in a criminal proceeding. This Court specifically rejected such procedures long ago in *People v Marion*, 29 Mich 31, 40-41 (1874). And the

(continued…)

26

Even if procedures for special jury findings existed here, the prosecution could not prove that the failure to submit these issues to the jury was harmless beyond a reasonable doubt.

> Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless. [*Id.* at 19.]

In this case, Harper had no opportunity to present contrary evidence. The majority relies on the fact that he did not object to the presentence investigation report (PSIR). But this reliance is misplaced.

"[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *Estelle v McGuire*, 502 US 62, 69; 112 S Ct 475; 116 L Ed 2d 385 (1991). The right to trial by jury is a basic right that cannot be waived, unless the waiver is fully informed and publicly acknowledged. *Taylor v Illinois*, 484 US 400, 418 n 24; 108 S Ct 646; 98 L Ed 2d 798 (1988). Harper decided not to object at sentencing to the information in his PSIR. When he did that, he could not have known that he was entitled to have the prosecution prove the statements contained

(…continued)
court rules do not permit our breaking with this longstanding precedent in this case.

in the PSIR beyond a reasonable doubt. Had he known that, and had he known that this Court would treat his failure to object as a waiver, he likely would have put the prosecution to its proofs. And it is not certain that the prosecution could have proved the information in the PSIR beyond a reasonable doubt.

In any event, the information in the PSIR does not support the judicial findings in this case beyond a reasonable doubt. The trial court's reasons for departure were:

> Guidelines do not include at least 3 parole revocations, abscondings from probation, Bench warrants from various courts and stealing from a charity that serves freezing children[.]

The PSIR only briefly mentions a bench warrant in the investigating agent's evaluation. Nothing in the PSIR talks of freezing children. In fact, the prosecution has presented no evidence to this Court to support either finding on these matters beyond a reasonable doubt. It is unknown if children were harmed by Harper's actions. And it is unclear what defenses Harper may have had against the unknown bench warrants. Therefore, the prosecution has not proved beyond a reasonable doubt that the error in this case was harmless. *Neder*, 527 US at 19. Resentencing is mandated.[19]

---

[19] I disagree with Justice Cavanagh's assessment that Harper's guilty plea and his statement that he did not contest the PSIR constituted an admission for Sixth Amendment analysis purposes. A waiver "consists of (1) specific knowledge of the constitutional right and (2) an intentional decision to abandon the protection of the constitutional right." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). Courts should endulge every reasonable presumption

(continued…)

## III. CONCLUSION

There was no need for the majority to reach the Sixth Amendment issue in *Burns*. The trial court failed to articulate substantial and compelling reasons to depart upward from the sentencing guidelines range. Burns must be resentenced without regard to the *Blakely* issue. Because he was not properly sentenced under existing law, the Sixth Amendment issue is not ripe for review.

Harper's sentence does violate the Sixth Amendment. The trial court based its departure sentence on facts that a jury never decided were true and that Harper never admitted. But for those findings, Harper would have received an intermediate sanction cell sentence, which could not have exceeded 12 months in jail. MCL 769.34(4)(a). But his sentence was four years in prison. This violated the Sixth Amendment, and it requires resentencing.

---

(…continued)
against waiver of a fundamental right. *Id*. at 260. This Court has set an even higher standard for an admission:

> [A] statement made by a party or his counsel, in the course of trial, is considered a binding judicial admission if it is a distinct, formal, solemn admission made for the express purpose of, *inter alia,* dispensing with the formal proof of some fact at trial. [*Ortega v Lenderink*, 382 Mich 218, 222-223; 169 NW2d 470 (1969).]

This case meets neither standard. Harper did not know that he was addressing his Sixth Amendment rights when he reviewed the PSIR at sentencing. And his plea did not address the facts used to depart from the sentence required by the intermediate sanction cell. Thus, his statements could not constitute a waiver, let alone an admission.

29

The *Harper* case illustrates that a grave constitutional problem arises in this state when *Blakely* is correctly applied. In its effort to save the Michigan sentencing guidelines, the majority fails to pay respect to the United States Supreme Court's Sixth Amendment precedent. When this precedent is properly applied, it becomes apparent that a major restructuring of Michigan's sentencing guidelines is in order.

Marilyn Kelly